

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-329-CV**

FIELDTECH AVIONICS & INSTRUMENTS,                    APPELLANTS
INC., KEVIN NELMS, AND DAVID MILLS

V.

COMPONENT CONTROL.COM, INC.,                         APPELLEES
D/B/A COMPONENT CONTROL;
CITICAPITAL TECHNOLOGY FINANCE,
INC., D/B/A BANKERS LEASING; AND
CITICORP USA, INC., D/B/A CITICAPITAL,
CITICAPITAL TECHNOLOGY FINANCE,
INC., BANKERS LEASING, AND SOFTECH
FINANCIAL

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

Appellants Fieldtech Avionics & Instruments, Inc., Kevin Nelms, and

David Mills appeal from the trial court's grant of summary judgment in favor of

Appellees (1) Component Control.Com, Inc., d/b/a Component Control; and (2)

CitiCapital Technology Finance, Inc., d/b/a Bankers Leasing and Softech

Financial, and CitiCorp USA, Inc., d/b/a CitiCapital, CitiCaptial Finance, Inc., Bankers Leasing, and Softech Financial (collectively, CitiCapital). We reverse in part and affirm in part.

## Background

Fieldtech is an avionics parts supplier. Component Control is a commercial software company. On August 24, 2001, Fieldtech signed a proposal generated by Component Control to acquire "Quantum Control Software 2K.4" ("the software") from Component Control. Fieldtech financed the transaction through a finance lease agreement with CitiCapital whereby CitiCapital acquired the software from Component Control and leased it to Fieldtech. Nelms and Mills—Fieldtech's president and secretary, respectively—personally guaranteed the lease. The transaction involved several documents: the proposal; a software maintenance agreement; the lease agreement and an associated property schedule and certificate of acceptance; and a "clickwrap agreement," an electronic agreement provided by Component Control that Fieldtech had to accept before it could download and install the

software.[1]  We will examine the relevant documents and testimony concerning their execution later in this opinion.

Fieldtech allegedly learned that the software was incompatible with its business operations when it sent two employees to Component Control for software training in January 2002.  Fieldtech sued Component Control and CitiCapital in October 2003.  Fieldtech sued Component Control for breach of contract, breach of warranty, and violations of the Deceptive Trade Practices Act, alleging that Component Control had represented that the software would meet Fieldtech's business needs.  Fieldtech sued CitiCapital for breach of contract and for a declaratory judgment, seeking a declaration of its rights under its lease agreement with CitiCapital.  CitiCapital filed a counterclaim against Fieldtech and third-party claims against Nelms and Mills, seeking to enforce the lease and Nelms's and Mills's guarantees.

---

[1] A clickwrap agreement derives its name from the similarities between such agreements and the licenses shrinkwrapped with many software packages. *Realpage*, *Inc. v. EPS, Inc.*, No. 4:06-CV-251, 2007 WL 2572255, at *5 (E.D. Tex. Sept. 5, 2007).  Clickwrap agreements allow users to manifest assent to contractual terms presented to the user before installation of computer software programs. *Id.*  Generally, the user must indicate acceptance of the clickwrap agreement to proceed with the installation. *Id.*  Texas courts recognize the validity of clickwrap agreements. *Id.*; *see also Barnett v. Network Solutions, Inc.*, 38 S.W.3d 200, 203–04 (Tex. App.—Eastland 2001, pet. denied).

3

After nineteen months of discovery, CitiCapital filed no-evidence and traditional motions for summary judgment, and Component Control filed a combined no-evidence and traditional motion for summary judgment. Fieldtech filed timely summary judgment responses. The trial court eventually granted summary judgment in favor of Component Control and CitiCapital and awarded CitiCapital $95,105.55 in damages and $28,205.83 in attorney's fees. Fieldtech, Nelms, and Mills filed this appeal.

### Summary Judgment Evidence

The parties presented the following relevant summary judgment evidence to the trial court.

### 1. Component Control's proposal

Component Control's proposal is a one-page printed document listing the software, software modules, installation, training, and maintenance to be provided by Component Control and the price for each item, with a total quote of $86,224.94. The area labeled "[p]lease sign to confirm your order" was signed by David Mills on August 24, 2001, and a line labeled "check here for third-party leasing" was checked.

### 2. The clickwrap license agreement

Lisa Wortman, Component Control's director of contract administration, averred that when a user attempts to install the software on a computer, a

4

clickwrap license agreement appears on the computer screen, and the software

will not install unless the user signifies acceptance of the license agreement.

Wortman attached two versions of the license agreement to her affidavit. The

first version is printed on Component Control letterhead; the second version,

said Wortman, is the actual clickwrap agreement that would have appeared on

Fieldtech's computer screen. The two versions are identical except that the

former contains headings in bold type and the latter does not. Both versions

contain the following warranty provisions:

> 6.3 Limited Warranty Remedies: During a period of thirty (30) days after delivery of the Software to Licensee, if the Licensee claims that the software is defective, Licensor shall either (i) replace such Software, provided that upon inspection by Licensor, Licensor has found the Software to be defective, or (ii) refund the amount paid therefor, if the Licensee returns the defective software to the Licensor with a copy of proof that the warranty period has not expired, and Licensor has verified the defect. Licensee agrees that Licensee's sole and exclusive remedy hereunder shall be limited to this corrective action.

> 6.4 Warranty Disclaimer: The express warranties set forth in the Agreement are in lieu of all other warranties, express or implied, including, without limitation, any warranties of merchantability or fitness for a particular purpose.

> 6.5 Limitation of remedies: Licensee agrees that its exclusive remedies, and Licensor's entire liability with respect to the Software, shall be as set forth herein. Licensee further agrees that Licensor shall not be liable to Licensee for any damages, including any lost profits, lost savings, or other incidental or other consequential damages arising out of its use or inability to use the

Software or the breach of any express or implied warranty, even if Licensor has been advised of the possibility of those damages.

3.     **Master Lease Agreement**

CitiCapital and Fieldtech executed a Master Lease Agreement setting out the terms under which CitiCapital leased the software to Fieldtech.  Fieldtech agreed to make monthly lease payments of $3,528.85 for thirty months.  The lease agreement contains the following relevant language:

> **1.  LEASE.**  LESSOR hereby leases and/or grants to LESSEE the right to use, and LESSEE hereby leases from and/or agrees to accept the right to use, subject to the terms and conditions herein set forth, the item(s) of personal property including but not limited to the hardware and/or software herein referred to as "Property" . . . .  Each Property Schedule entered into by the parties shall constitute a separate non-cancellable lease agreement . . . .
>
> . . . .
>
> **4.  DISCLAIMER OF WARRANTIES.** (A) LESSEE ACKNOWLEDGES THAT LESSEE MADE THE SELECTION OF THE PROPERTY BASED ON ITS OWN JUDGMENT AND IS NOT RELYING ON LESSOR'S SKILL OR JUDGMENT TO SELECT OR FURNISH GOODS SUITABLE FOR ANY PARTICULAR PURPOSE.  LESSEE ACKNOWLEDGES THAT LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, DIRECTLY OR INDIRECTLY, INCLUDING, WITHOUT LIMITATION, THE WARRANTY OF MERCHANTABILITY AND OF FITNESS, CAPACITY OR DURABILITY FOR ANY PARTICULAR PURPOSE, AND WARRANTIES AS TO THE DESIGN OR CONDITION OF THE PROPERTY AND THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE PROPERTY. LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER, INCLUDING ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, TO ANY EXTENT WHATSOEVER, RELATING TO OR

6

ARISING OUT OF THE SELECTION, QUALITY, CONDITION, MERCHANTABILITY, SUITABILITY, FITNESS, OPERATION OR PERFORMANCE OF THE PROPERTY.   NO DEFECT IN OR UNFITNESS OF THE PROPERTY SHALL RELIEVE LESSEE OF ITS OBLIGATIONS UNDER THE LEASE. . . .

(B) For the term of the LEASE, or any extension thereof, LESSOR hereby assigns to LESSEE and LESSEE may have the benefit of any and all Vendor's warranties . . . if any, with respect to the Property to the extent assignable by LESSOR, provided, however, that LESSEE'S sole remedy for the breach of any such warranty . . . shall be against the Vendor and not against the LESSOR, nor shall any such breach have any effect whatsoever on the rights and obligations of either party with respect to the LEASE.

**5.    STATUTORY FINANCE LEASE.**    LESSEE agrees and acknowledges that it is the intent of both parties to the LEASE that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code.  LESSEE acknowledges and agrees the LESSEE has selected both: (1) the Property; and (2) the Vendor from whom the property is to be acquired.  LESSEE acknowledges that LESSOR has not participated in any way in LESSEE'S selection of the Property or of the Vendor, and LESSOR has not selected, manufactured, or supplied the Property.

LESSEE IS ADVISED THAT IT MAY HAVE RIGHTS UNDER THE CONTRACT EVIDENCING THE ACQUISITION OF THE PROPERTY FROM THE VENDOR CHOSEN BY THE LESSEE AND THAT LESSEE SHOULD CONTACT THE VENDOR OF THE PROPERTY FOR A DESCRIPTION OF ANY SUCH RIGHTS.

. . . .

**18.  DEFAULT.**  . . . If LESSEE fails to pay any rent or other amounts required . . . LESSOR or its agents shall have the right . . . to declare the entire amount of rent hereunder immediately due and payable . . . .

To the extent permitted by applicable law, the LESSEE waives any and all rights and remedies conferred upon a LESSEE by UCC Sections 2A-508 through 2A-522, including (without limitation) the LESSEE'S rights to (a) cancel or repudiate the LEASE, (b) reject or revoke acceptance of the leased Property, (c) recover damages from LESSOR for breach of warranty or for any other reason . . . .

. . . .

**22. NET LEASE.** The LEASE is a net lease and LESSEE agrees that its obligation to pay all rent and other sums payable thereunder are absolute and unconditional and shall not be subject to any abatement, reduction, setoff, defense, counterclaim or recoupment for any reason whatsoever.

. . . .

**27. ENTIRE AGREEMENT, WAIVER.** This Instrument constitutes the entire agreement between the parties.

## 4.    Certificate of Acceptance

Kevin Nelms, as Fieldtech's president, executed a document provided by

CitiCapital and titled "Certificate of Acceptance" on October 19, 2001, which

provides,

We certify that [the software] was delivered to and installed at [Fieldtech] in good order and condition and acceptable to us, is ready for its intended use as of the date hereof, and is acceptable for maintenance by the maintenance provider, and the quantity, description and serial numbers are correct.

## 5.    Kevin Nelm's affidavit

Nelms averred that Component Control contacted Fieldtech beginning in

2001 to sell software to Fieldtech. Nelms stated that Fieldtech communicated

8

the nature of its business to Component Control, including its need for software that would allow Fieldtech to quickly and easily provide quotes to customers and access customers' historical purchasing records for credit evaluations. According to Nelms, Component Control represented that its software would be useful to Fieldtech and would work in Fieldtech's business environment. Nelms averred that the only reason Fieldtech agreed to lease the software was because Component Control represented that it would work for Fieldtech.[2]

Nelms stated that when Fieldtech signed the proposal and software maintenance agreement on August 24, 2001, it did not intend that the proposal be a complete and exclusive expression of the agreement between the parties but "merely a business confirmation from Component Control created for its internal purposes and to confirm that an agreement had been reached." Shortly after Fieldtech signed the proposal, Component Control delivered the software, but Nelms said that Fieldtech did not begin "any real use" of the software until it completed CitiCapital's financing documents six weeks later. Nelms signed a Master Lease Agreement with CitiCapital on September 24, 2001.

---

[2] In deposition testimony, Nelms testified that Component Control had demonstrated the software's operation to Fieldtech telephonically and through a webcast.

Nelms acknowledged that he signed a "Certificate of Acceptance" sent to Fieldtech by CitiCapital and that the certificate indicated that the "software was considered placed in service on October 19, 2001," but he averred that Fieldtech did not "use the software in any sense through the remainder of 2001" because Fieldtech was arranging software training with Component Control. Nelms said that he signed the certificate merely to acknowledge receipt of the software and that he did not intend to acknowledge that the software fully satisfied Component Control's agreements and representations. Nelms stated that he "felt assured" that CitiCapital's intent was to finance software that Fieldtech actually needed. Nelms said that CitiCapital and Component Control both assured him that Fieldtech would not be obligated for the whole proposal amount unless and until the software was working for Fieldtech and Component Control had provided the necessary services.

Nelms averred that two Fieldtech employees attended a software training class at Component Control in January 2002. He stated that after two days of the five-day class, the employees realized that the software would not work for Fieldtech because it would not allow Fieldtech to quickly quote prices to potential customers. Nelms said that he communicated to Component Control the fact that the software would not work for Fieldtech and that he considered

10

such communication to be notice revoking any acceptance of the software that Fieldtech had given.

Nelms stated that he did not remember whether the clickwrap agreement appeared when Fieldtech installed the software but that he had no specific reason to believe that it did not appear.

### 6. Affidavit of Carol Beckham

Carol Beckham, Fieldtech's accounts manager, averred that she was one of the two Fieldtech employees who attended Component Control's software training class in January 2002. She stated that after two days of training, it was apparent to her that the software would not work for Fieldtech. Beckham said that she communicated to Component Control and CitiCapital that the software would not work for Fieldtech and was not what Fieldtech needed. Her affidavit lists by date and amount the nine payments Fieldtech made to CitiCapital under the lease.

### Standards of Review

When a party moves for both a traditional summary judgment under rules166a(c) and a no-evidence summary judgment under rule 166a(i), we first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant failed to produce more than a scintilla of evidence under that burden, then there

is no need to analyze whether appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

**1.    No-evidence summary judgment**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.  TEX. R. CIV. P. 166a(i).   The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex. 2002).   The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX. R. CIV. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex. 2006).   If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

12

**2. Traditional summary judgment**

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* TEX. R. CIV. P. 166a(b), (c). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798.

A plaintiff or counterplaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* TEX. R. CIV. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 798.

**Discussion**

**1. Finance Lease Agreement**

Fieldtech and CitiCapital agree that the lease between them is a statutory finance lease. A finance lease is a three-party transaction governed by article 2A of the Uniform Commercial Code, TEX. BUS. & COM. CODE ANN. Ch. 2A

(Vernon 1994 & Supp. 2008). The UCC defines a finance lease as "a lease with respect to which . . . the lessor does not select, manufacture, or supply the goods"; "the lessor acquires the goods or the right to possession and use of the goods in connection with the lease"; and one of four other conditions is met, i.e., (i) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to their use and possession; (ii) the lessee's approval of the contract by which the lessor acquired the goods or the right to their use and possession is a condition to the effectiveness of the lease; (iii) the lessee, before signing the lease contract, receives a statement designating the promises and warranties and disclaimers provided to the lessor by the third-party supplier; or (iv) if the lease is not a consumer lease, the lessor informs the lessee in writing of (a) the identity of the supplier unless the lessee has selected the supplier and directed the lessor to acquire the goods or the right to use and possession, (b) the lessee's entitlement to promises and warranties provided to the lessor by the supplier, and (c) the lessee's right to communicate with the supplier and receive the warranties and disclaimers from it. *Id.* § 2A.103(7) (Vernon Supp. 2008). The lease in this case meets the statutory requirements for a finance lease, including the last of the enumerated conditions.

In a finance lease, the UCC does not imply warranties of merchantability and fitness running from the lessor to the lessee. *Id*. §§ 2A.212, 2A.213

14

(Vernon 1994) (creating implied warranties of merchantability and fitness in lease agreements "[e]xcept in a finance lease"). Instead, "[t]he benefit of a supplier's promises to the lessor under the supply contract and all warranties, whether express or implied . . . extends to the lessee . . . but is subject to the terms of the warranty and of the supply contract and all defenses or claims arising therefrom." *Id.* § 2A.209(a) (Vernon Supp. 2007). Thus, a finance lessee's remedies for defective or nonconforming goods or for breach of warranty run against the supplier of the goods, not the lessor, and are governed by UCC article 2. *See id.* & cmt.

**2.    Component Control's motion**

In its first issue, Fieldtech argues that the trial court erred by granting summary judgment in favor of Component Control because Component Control's no-evidence motion was procedurally inadequate and because the summary judgment evidence raises fact issues with regard to all of Fieldtech's causes of action.

**a.    Adequacy of no-evidence motion**

Fieldtech contends that the no-evidence portion of Component Control's summary judgment motion is procedurally inadequate because it fails to distinguish between no-evidence and traditional summary judgment grounds and because it fails to specifically identify the elements of Fieldtech's causes of

15

action for which Component Control claims there is no evidence. Fieldtech raised these alleged procedural defects in special exceptions filed in the trial court.[3]

A no-evidence motion must state the elements as to which there is no evidence and must be specific in challenging the evidentiary support for a claim or defense; rule 166a(i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case.[4] TEX. R. CIV. P. 166a(i) & cmt. A no-evidence challenge that only generally challenges the sufficiency of the nonmovant's case and fails to state specific elements is fundamentally

---

[3] The record does not show that the trial court ruled on Fieldtech's special exceptions, but a trial court implicitly overrules special exceptions when it grants summary judgment on the motion to which the special exceptions pertain. *Clement v. City of Plano*, 26 S.W.3d 544, 550 n.5 (Tex. App.—Dallas 2000, no pet.), *overruled on other grounds by Telthorster v. Tennell*, 92 S.W.3d 457, 464 (Tex. 2002); *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 795 n.9 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

[4] Component Control argues that the no-evidence portion of its motion obviously gave Fieldtech adequate notice as to what specific elements lacked evidentiary support because Fieldtech filed two summary judgment responses attempting to show evidentiary support for the challenged elements. Because rule 166a(i) uses the unconditional term "must" in expressly directing no-evidence summary judgment movants to state the elements as to which there is no evidence, we decline to extend a "fair notice" exception to rule 166a(i)'s specific-elements requirement. *See Mott v. Red's Safe & Lock Servs., Inc.*, 249 S.W.3d 90, 98 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 4 (Tex. App.—San Antonio 2000, pet. denied) (both rejecting similar "fair-notice" arguments).

16

defective and insufficient to support summary judgment as a matter of law. *Mott*, 249 S.W.3d at 98. But a specific attack on the evidentiary components that might prove a certain element is unnecessary, as long as the element itself is specifically challenged. *See* TIMOTHY PATTON, SUMMARY JUDGMENT IN TEXAS, PRACTICE, PROCEDURE AND REVIEW § 5.03[2][b] (3d ed. 2006). A summary judgment movant may combine no-evidence and traditional grounds in the same motion. *Binur v. Jacobo*, 135 S.W.3d 646, 650–51 (Tex. 2004). A motion that combines both bases for summary judgment is sufficient if it sets forth its grounds clearly and otherwise complies with rule 166a. *See id*. at 651.

With regard to Fieldtech's breach of contract claim, Component Control argued that "there is no evidence that Fieldtech did not receive the Software it leased or that the Software did not perform." With regard to alleged DTPA violations, Component Control argued that "there is simply no evidence of any misrepresentation or unconscionable act by Component Control." We hold that these no-evidence challenges are sufficiently specific to pass rule 166a(i) muster. *See* TEX. R. CIV. P. 166a(i) & cmt.

But with regard to breach of warranty, after lengthy arguments analyzing the language of the relevant agreements, Component Control stated conclusorily, "As a matter of law, therefore, Component Control did not breach an express warranty and Fieldtech has no evidence to show that it did," and

17

"As a matter of law, therefore, Component Control did not breach an implied warranty and Fieldtech has no evidence to show that it did." These two statements do not challenge specific elements of Fieldtech's breach of warranty claim as required by rule 166a(i); rather, they are vague and general statements tacked on to the end of the traditional summary judgment arguments. We therefore hold that the no-evidence portion of Component Control's summary judgment motion dealing with breach of warranty did not comply with rule 166a(i)'s requirement for specificity, and we will review the summary judgment relating to breach of warranty under the traditional summary judgment rules. *See* TEX. R. CIV. P. 166a(c), (i).

**b.    Breach of contract**

Component Control argues that there is no evidence that it breached its agreement with Fieldtech because Component Control agreed only to provide and did provide the Quantum Control software to Fieldtech but did not agree to provide software that would be "useful" to Fieldtech or perform the functions Fieldtech allegedly requires, namely, the ability to look up customers' order histories and quickly generate quotes. Fieldtech contends that the proposal was not a complete agreement and that Fieldtech may therefore rely on parol evidence to explain the parties' true agreement.

18

The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff. *Harris v. Am. Prot. Ins. Co.,* 158 S.W.3d 614, 622–23 (Tex. App.—Fort Worth 2005, no pet.). Because Component Control's no-evidence motion challenged the third element, our analysis will focus primarily on whether Fieldtech produced any evidence that Component Control breached its agreement. But before we can determine whether Fieldtech presented any evidence of a breach of the agreement, we must first examine the agreement itself and determine whether Component Control promised that the software would provide the functionality required by Fieldtech, namely, the ability to look up a customer's order history and quickly generate quotes.

Because Fieldtech's rights against Component Control are governed by UCC article 2, we look to article 2 to guide our analysis. Under article 2, parol evidence of a contemporaneous oral agreement may explain or supplement, but not contradict, the terms of a written agreement between the contracting parties unless the court finds that the parties intended the writing to be a complete and exclusive statement of the terms of the agreement:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect

19

to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of performance, course of dealing, or usage of trade (Section 1.303) and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM. CODE ANN. § 2.202 (Vernon Supp. 2008).[5]

We turn now to the writings at issue with regard to Component Control, the proposal and the clickwrap agreement. The first question is whether the writings were intended as a "complete and exclusive statement of the terms of the agreement." TEX. BUS. & COM. CODE ANN. § 2.202. Neither writing contains an express merger or integration clause or any language to show that the parties intended either document to be a complete and exclusive statement

---

[5] Component Control argues that absent pleading and proof of ambiguity, fraud, accident, or mistake, a written agreement presumes that all prior agreements have merged into the agreement and its provisions cannot be added to, varied, or contradicted by parol evidence. But one of the cases cited by Component Control is a real property case, to which the UCC does not apply. *See Thompson v. Chrysler First Bus. Corp.*, 840 S.W.2d 25, 33 (Tex. App.—Dallas 1992, no writ); TEX. BUS. & COM. CODE ANN. § 2.102 (Vernon 1994). And while the other case cited by Component Control was apparently within the scope of the UCC, it did not reference or discuss the UCC, and the written agreement in that case—unlike the writings in this case—contained a clear and unambiguous merger and integration clause. *See i2 Techs., Inc. v. DARC Corp.*, No. Civ. 3:02-CV-0327-H, 2003 WL 22205091, at *6 (N.D. Tex. Sep. 23, 2003).

of the terms of the agreement. Indeed, the fact that Component Control included the clickwrap agreement in the software indicates that it did not intend the proposal to be a

complete and exclusive statement of the agreement, and the clickwrap agreement itself is not complete or exclusive because it omits crucial terms, such as price. Nor do the writings suggest that the parties intended them to be final expressions of their agreement. Therefore, Fieldtech may present parol evidence of contemporaneous oral agreements that explain or supplement the terms of the proposal and the clickwrap agreement. *See id.*

The second question is whether Fieldtech presented summary judgment evidence explaining or supplementing the terms of the writings. *See id.* We look first to the terms of the writings. Component Control's proposal identifies the software and included software modules by name and price, but it does not identify or recite any particular features or functionality of the software. The clickwrap agreement likewise identifies the software and included modules but does not specify any functionality, uses, or benefits of the software.

Next, we look to the parol evidence presented by Fieldtech to determine whether it supplements or explains the terms of the writings. In his affidavit, Nelms averred that

21

In response [to Nelms's discussions with Component Control personnel about the nature of Fieldtech's business], these Component Control personnel represented that the software it was trying to sell Fieldtech would be useful to Fieldtech and would [fulfill the needs Fieldtech expressed to Component Control].

. . . The only reason the agreement was for "Quantum Control" software is that such software was what Component Control represented would work for Fieldtech. Fieldtech was not interested [in leasing], and did not agree to lease, the Quantum Control software no matter whether or not it was useful to Fieldtech. Rather, Fieldtech's agreement with Component Control was simply to purchase software that was useful to Fieldtech and effectively met Fieldtech's needs.

Nelms's affidavit supplements, but does not contradict, the terms of the proposal and the licensing agreement. The proposal states that Component Control would provide the software; Nelms's affidavit supplements the proposal by explaining what the parties allegedly agreed the software would actually do. Thus, Nelms's affidavit creates a fact issue as to a contemporaneous oral agreement that supplements the terms of the written agreements between Fieldtech and Component Control. *See id.*

Finally, we look to Fieldtech's summary judgment evidence to determine whether it raised a fact issue as to whether Component Control breached the agreement as supplemented by Nelms's affidavit. Nelms averred that the software "simply would not work for Fieldtech" because—among other things—it requires a user to input "a myriad of information" regarding a

22

potential customer before the user can generate a quote and does not allow a user to access a customer's historical information. He stated that "the software did not satisfy what Component Control agreed and represented it would provide to Fieldtech, and it was not useable for the purposes for which Fieldtech communicated to Component Control it needed the software."

Component Control argues that Nelms's affidavit does not raise a fact issue because he testified in his deposition that he merely had the "impression" that the software would do everything Fieldtech wanted it to, Fieldtech could present no documents containing the software specifications alleged by Nelms, and Nelms's affidavit is the self-serving testimony of an interested witness. We will consider each of these three alleged defects in turn. First, it is well established that a deposition does not have controlling effect over an affidavit when determining whether a motion for summary judgment should be granted. *Davis v. City of Grapevine*, 188 S.W.3d 748, 755 (Tex. App.—Fort Worth 2006, pet. denied). When a deposition and an affidavit filed by the same party in opposition to a motion for summary judgment conflict, a fact issue is presented that will preclude summary judgment. *Id.* Thus, to the extent that Component Control argues that Nelms's affidavit conflicts with his earlier deposition testimony, that conflict itself creates a fact issue. Second, UCC section 2.201 specifically contemplates parol evidence of contemporaneous *oral*

23

agreements to supplement or explain written agreements; thus, no documents are required to create a fact issue. *See* TEX. BUS. & COM. CODE ANN. § 2.201 (Vernon 1994). Third, while testimony from an interested witness cannot serve as a basis for *granting* summary judgment in some instances, it is enough to create a fact issue that justifies *denying* summary judgment*.* "Uncontroverted evidence . . . from an interested witness does nothing more than raise a fact issue unless it is clear, positive and direct, otherwise credible, and free from contradictions and inconsistencies, and could have been readily controverted." *Reynolds v. Murphy*, 188 S.W.3d 252, 262 (Tex. App.—Fort Worth 2006, pet. denied), *cert. denied*, 127 S. Ct. 1839. Because Fieldtech sought to create a fact issue and defeat summary judgment rather than negate a fact issue and obtain summary judgment, Nelms's interested affidavit is competent summary judgment evidence.

Component Control argues that this case is like *BubbaJunk.com, Inc. v. Momentum Software, Inc.*, in which the Austin court held that a written but unsigned "software requirements specification" did not impose additional contractual obligations on a software developer. No. 03-03-00590-CV, 2004 WL 904081, at *4 (Tex. App.—Austin Apr. 29, 2004, pet. denied). In that case, BubbaJunk and Momentum entered into a written consulting contract in which Momentum promised to perform software- and Internet-development

24

services described in two work authorizations attached to and incorporated into the contract. *Id.* The contract required that changes to the scope of the services be in writing and executed by both parties. *Id.* When BubbaJunk failed to make payments under the contract, Momentum sued for breach of contract and eventually moved for summary judgment on its claim. *Id.* at *3. BubbaJunk asserted promissory estoppel as an affirmative defense, alleging that Momentum made additional promises regarding the scope of its services in an unsigned software requirements specification. *Id.* at *3, 4. The court held that because the software requirements specification was not executed by both parties, it was not a part of the contract and would not support BubbaJunk's promissory estoppel defense. *Id*. at *4.

This case is distinguishable from *BubbaJunk.* The contract in *BubbaJunk* was the complete, integrated agreement between the parties. Neither of the writings in this case—the proposal and the clickwrap agreement—is a complete expression of the parties' agreement, and neither contains a merger or integration clause. The clickwrap agreement includes a provision stating that "[t]his Agreement shall be modified only by a written agreement duly executed by Licensor and Licensee," but "this Agreement"—the clickwrap agreement—says nothing about the software's functionality; thus, Component Control's alleged oral promises about the software's functionality do not modify

25

the clickwrap agreement. For these reasons, *Bubbajunk* does not guide our analysis.

Nelms testified that Component Control promised that the software would meet Fieldtech's needs, and he testified that the software failed to meet Fieldtech's needs. We therefore hold that Fieldtech created a fact issue as to whether Component Control breached its agreement with Fieldtech; thus, the trial court erred by granting Component Control's no-evidence summary judgment motion on Fieldtech's breach of contract claim. *See* TEX. R. CIV. P. 166a(i). For the same reasons, the trial court erred by granting Component Control's traditional motion for summary judgment, in which Component Control sought to conclusively negate the "breach" element of Fieldtech's breach of contract claim. *See* TEX. R. CIV. P. 166a(c).

Component Control also moved for summary judgment because Fieldtech suffered no injury from Component Control's purported breach of contract, arguing cursorily that "[o]nce again, there is no performance issue. . . . There is no injury because Fieldtech's change of heart is not a breach by Component Control." Because we have already held that the summary judgment evidence raises a fact question as to whether Component Control breached its agreement with Fieldtech, we likewise hold that the trial court erred by granting summary judgment on Component Control's "no injury" argument. *See id.*

26

### c.   Breach of warranty[6]

In its motion for summary judgment, Component Control argued that it conclusively negated the existence of any express or implied warranties because Component Control disclaimed all such warranties in the clickwrap agreement.

#### i.   Implied warranties

Contracts for the sale of goods imply warranties of merchantability and fitness for a particular purpose. TEX. BUS. & COM. CODE ANN. § § 2.314, 2.315 (Vernon Supp. 1994). To exclude the implied warranty of merchantability, the exclusionary language must mention "merchantability," be in writing, and be conspicuous. *Id.* § 2.316(b) (Vernon 1994). Likewise, to exclude an implied warranty of fitness, the exclusionary language must be in writing and be conspicuous. *Id.* Language is "conspicuous" in a disclaimer of an implied warranty if it is in larger type or other contrasting font or color. *Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 279 (Tex. App.—Tyler 2002, no pet.); TEX. BUS. & COM. CODE ANN. § 1.201(10) (Vernon 1994) (defining "conspicuous" as "so written . . . that a reasonable person against [whom] it

---

[6] As we noted above, we will analyze Component Control's summary judgment motion on Fieldtech's breach of warranty claim under the rules governing traditional motions for summary judgment.

is to operate ought to have noticed it" and providing that language in the body of a form is "conspicuous" if it is in larger or other contrasting type, font, or color). Whether language is conspicuous is a question of law for the court to resolve. *Womco, Inc.*, 84 S.W.3d at 279.

The warranty disclaimer Component Control relies on appears in the clickwrap agreement and states that "Licensor shall not be liable to Licensee for any damages . . . arising out of . . . the breach of any express or implied warranty." This language, which appears on the third page of the five-page clickwrap agreement, is not in larger type or other contrasting font or color. We therefore hold that it is not "conspicuous" as a matter of law and was ineffective to disclaim the implied warranties of merchantability and fitness. *See* TEX. BUS. & COM. CODE ANN. § 2.316(b). Because the disclaimer was the sole basis of Component Control's motion for summary judgment with regard to Fieldtech's claim for breach of implied warranties, the trial court erred by granting summary judgment on this claim.[7]

---

[7] On appeal, Component Control argues that even if the disclaimer was ineffective, the only evidence before the trial court "confirms" that Component Control did not breach any warranties. But Component Control did not assert this argument as a ground for summary judgment in the trial court, and summary judgment cannot be granted except on the grounds expressly presented in the motion. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 204 (Tex. 2002); *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 912 (Tex. 1997). Therefore, we cannot affirm the summary judgment on this basis.

### ii. Express warranties

Any affirmation of fact or promise made by the seller to the buyer that relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation or promise. TEX. BUS. & COM. CODE ANN. § 2.313(a)(1) (Vernon 1994). Likewise, any description of the goods that is made part of the basis of the bargain creates an express warranty that the goods will conform to the description. *Id.* § 2.313(a)(2). It is not necessary to the creation of an express warranty that the lessor use formula words, such as "warrant" or "guarantee," or that the lessor have a specific intent to make a warranty. *Id.* § 2.313(b).

Unlike disclaimers of implied warranties, the UCC does not require conspicuous language for the disclaimer of express warranties. *See id.* § 2.316(b). But a disclaimer of an express warranty must be communicated to a buyer before the sale is consummated; otherwise, the disclaimer language is inoperative. *Mercedes-Benz of N. Am., Inc. v. Dickenson,* 720 S.W.2d 844, 852 (Tex. App.—Fort Worth 1986, no writ) (holding automobile dealer's disclaimer of express warranties ineffective when buyer was uninformed of disclaimer until he found it in the car's glove box after consummating the sale); *see also Womco, Inc.*, 84 S.W.3d at 279.

In this case, Fieldtech signed Component Control's proposal on August 24, 2001. Nothing in the record suggests—and Component Control does not argue—that Fieldtech was made aware of the clickwrap agreement and its warranty disclaimer until Fieldtech installed the software in October 2001, two months after the parties had entered into a binding agreement for the lease of the software. We therefore hold that the clickwrap agreement's disclaimer of express warranties was ineffective as a matter of law and that the trial court erred by granting summary judgment with regard to Fieldtech's claim for breach of express warranty.

### d. DTPA claims

Component Control asserted that it was entitled to a no-evidence summary judgment because there is no evidence of any misrepresentation or unconscionable act by Component Control, and it asserted that it was entitled to a traditional summary judgment because Fieldtech's claim was barred by limitations[8] and because Component Control had disclaimed all warranties.

---

[8] Component Control also moved for no-evidence summary judgment on limitations but, as Fieldtech observes, it was not entitled to a no-evidence summary judgment on limitations because limitations is an affirmative defense on which Component Control would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i) (providing that a party may move for no-evidence summary judgment on a claim or defense on which an adverse party would have the burden of proof at trial).

30

### i. Evidence of misrepresentations

The DTPA creates a cause of action for false, misleading, or deceptive acts or practices, including misrepresentations that goods have characteristics, uses, or benefits that they do not have. TEX. BUS. & COM. CODE ANN. § § 17.46(b)(7), 17.50(a) (Vernon 2008). We have already recounted the evidence presented by Nelms's affidavit regarding representations he alleges Component Control made to Fieldtech about the suitability of the software to Fieldtech's needs and his averment that the software failed to meet those needs. Nelms's affidavit is some evidence that Component Control made misrepresentations about the characteristics, uses, or benefits of the software. Thus, Component Control was not entitled to no-evidence summary judgment on Fieldtech's DTPA claims.

### ii. Limitations

A consumer must commence a DTPA action within two years of the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. *Id.* § 17.565 (Vernon 2002).

Component Control argues that Fieldtech's DTPA claims are barred by limitations because Component Control would have made any alleged

31

misrepresentations before Fieldtech signed the proposal in August 2001, but Fieldtech did not file suit until October 16, 2003—more than two years later. Fieldtech replies that it did not discover that the software was not as Component Control represented until it sent two employees for software training in January 2002.

Nelms avers in his affidavit that Fieldtech installed the software on October 19, 2001, but did not use it for the remainder of the year. He further stated that it was not until Fieldtech employees attended training in January 2002 that Fieldtech discovered that the software would not suit Fieldtech's needs, contrary to Component Control's alleged representations. We hold that Nelms's affidavit is some evidence that Fieldtech could not have discovered Component Control's alleged misrepresentations until January 2002, less than two years before Fieldtech filed suit. Thus, Component Control did not conclusively establish the affirmative defense of limitations and was not entitled to a traditional summary judgment on this basis.

### iii. DTPA warranty claims

The DTPA does not create any warranties, but it does create a cause of action for breach of an express or implied warranty. *Id.* § 17.50(a)(2). Component Control argues that it is entitled to summary judgment because the summary judgment evidence conclusively proves that it effectively disclaimed

32

all express and implied warranties as a matter of law. We have already analyzed Component Control's warranty-disclaimer argument in connection with Fieldtech's breach of warranty claims and determined that the disclaimer was ineffective. For the same reasons, we hold that Component Control is not entitled to summary judgment on Fieldtech's DTPA warranty claims.

### e. Conclusion

Having determined that Component Control is not entitled to summary judgment on Fieldtech's breach of contract, breach of warranty, and DTPA claims, we hold that the trial court erred by granting summary judgment in Component Control's favor, and we sustain Fieldtech's first issue.

### 3. CitiCapital's motions

Fieldtech sued CitiCapital for (1) breach of contract, alleging that CitiCapital made improper and unauthorized charges and payments under the lease; and (2) a declaratory judgment that the lease was unenforceable, alleging a complete lack of consideration. CitiCapital filed a motion for no-evidence summary judgment, asserting that there was no evidence that CitiCapital made improper or unauthorized charges or payments under the lease and no evidence

33

that CitiCapital had breached the lease.[9] CitiCapital also filed a traditional motion for summary judgment, arguing that as a matter of law, failure of consideration is not a defense to Fieldtech's obligations under the lease, that Fieldtech was in default, and that Nelms and Mills were liable on their guarantees for all sums owing under the lease. CitiCapital filed a further traditional motion for partial summary judgment on the issue of attorney's fees. The trial court granted all three motions and awarded CitiCapital damages of $95,105.55 and attorney's fees of $28,205.83.

### a. Enforceability of lease

Fieldtech argues that the trial court erred by granting summary judgment in favor of CitiCapital on Fieldtech's causes of action because there is at least a fact issue as to whether Fieldtech revoked its acceptance of the software, thereby rendering the lease unenforceable. CitiCapital responds that Fieldtech specifically waived its right to revoke acceptance of the software.

---

[9] As it did with Component Control's no-evidence motion, Fieldtech challenges the sufficiency of CitiCapital's no-evidence motion. But unlike Component Control's motion, CitiCapital's specifically identifies elements of Fieldtech's causes of action for which there is no evidence. Therefore, we reject Fieldtech's insufficiency argument with regard to CitiCapital's no-evidence motion. *See* TEX. R. CIV. P. 166a(i).

### i. Hell or high water clause

The finance lease between Fieldtech and CitiCapital contains what is commonly referred to as a "hell or high water" clause. A hell or high water clause requires that the lessee, once it accepts the leased item, must pay its rent in all events (i.e., come hell or high water) without regard for the proper function of the item or the conduct of the lessor with respect to the subject or any other transaction. *Excel Auto & Truck Leasing, L.L.P. v. Alief ISD*, 249 S.W.3d 46, 51 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The UCC provides that hell or high water clauses are enforceable in finance leases:

> (a) In the case of a finance lease that is not a consumer lease, a term in the lease agreement that provides that the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods is enforceable.

> (b) A promise that has become irrevocable and independent under Subsection (a):

>> (1) is effective and enforceable between the parties, and by or against third parties including assignees of the parties; and

>> (2) is not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs.

TEX. BUS. & COM. CODE ANN. § 2A.407 (Vernon Supp. 2008).

The lease agreement between Fieldtech and CitiCapital states that it is "non-cancellable," that "no defect in or unfitness of the property shall relieve

[Fieldtech] of its obligations under the lease," that the breach of any warranty by Component Control will not "have any effect whatsoever on the rights and obligations of either party with respect to the lease," and that Fieldtech's "obligation to pay all rent and other sums payable [under the lease is] absolute and unconditional." Thus, Fieldtech agreed to make payments under the lease come "hell or high water," that is, even if the software proved to be defective or useless.

### ii. Waiver of right to revoke acceptance

Fieldtech points to the comment to section 2A.407, which states that a hell or high water clause "remain[s] subject to . . . the lessee's revocation of acceptance (section 2A-517)." *Id.* cmt 1. Section 2A.517 provides that a lessee in a finance lease may revoke acceptance of goods the nonconformity of which substantially impairs their value to the lessee if the lessee has accepted them without discovery of the nonconformity if the lessee's acceptance was reasonably induced by the lessor's assurances. *Id.* § 2A.517(a)(2) (Vernon 2002). Fieldtech argues that Nelms's affidavit creates a fact issue as to whether CitiCapital's assurances reasonably induced Fieldtech to accept the software and whether Fieldtech effectively revoked its acceptance.

36

CitiCapital replies that Fieldtech specifically waived its right to revoke acceptance in paragraph 18 of the lease agreement, which provides that

> [t]o the extent permitted by applicable law, the LESSEE waives any rights and remedies conferred upon a LESSEE by UCC Sections 2A-508 through 2A-522, including (without limitation) the LESSEE'S rights to . . . revoke acceptance of the leased Property . . . .

UCC section 1.302(a) states that "[e]xcept as otherwise provided in Subsection (b) or elsewhere in this title, the effect of provisions of this title may be varied by agreement." *Id.* § 1.302(a) (Vernon Supp. 2008). Thus, an agreement can change the legal consequences that flow from the provisions of the UCC. *Id*. § 1.302(a) cmt. 1. Subsection (b) provides that the obligations of good faith, diligence, reasonableness, and care may not be disclaimed by agreement. *Id.* § 1.302(b).

Nothing in the UCC precludes an agreement between a finance-lease lessor and lessee to restrict or waive a lessee's right to revoke acceptance under section 2A.517(a)(2). In this case, the waiver of Fieldtech's right to revoke acceptance is clear and unambiguous. Therefore, even if we assume that Fieldtech attempted to revoke acceptance of the software when it learned the software did not suit its needs, such revocation did not render the lease unenforceable as a matter of law because Fieldtech had already waived its right to revoke acceptance. We therefore hold that the trial court did not err by

37

granting summary judgment in favor of CitiCapital on its counterclaim to enforce the lease and on Fieldtech's cause of action for a declaration that the lease was unenforceable.

### b. Unauthorized and improper charges

Fieldtech argues that Carol Beckham's affidavit created a fact issue as to improper and unauthorized charges allegedly made by CitiCapital and, therefore, created a fact issue as to whether CitiCapital breached the lease agreement. In her affidavit, Beckham listed the nine payments Fieldtech had made to CitiCapital by date, as follows:

| | |
|---|---|
| July 2002 | $3,500.00 |
| August 2002 | $3,500.00 |
| October 2002 | $5,000.00 |
| December 2002 | $5,000.00 |
| January 2003 | $5,000.00 |
| February 2003 | $5,000.00 |
| March 2003 | $5,000.00 |
| April 2003 | $1,199.80 |
| July 2003 | $5,000.00 |
| Total | $38,199.80[10] |

---

[10] Beckham averred that these payments added up to $43,199.80.

38

Beckham averred that "it has been difficult to determine the amount Fieldtech should actually owe under the lease" and that "CitiCapital could never explain the calculation or the reason for the tax and insurance charges they were making to Fieldtech." Based on Beckham's affidavit, Fieldtech argues that "there is at least a genuine fact issue regarding the issue of whether CitiCapital correctly applied the payments made by Fieldtech and whether CitiCapital's charges under the lease are correct."

The lease agreement called for Fieldtech to make monthly payments of $3,528.85 beginning 180 days after the first day of the calendar quarter after Fieldtech installed the software, or June 30, 2002. The lease was a "net" lease—that is, the basic lease payments were "net" of any other sums due—and specifically required Fieldtech to pay for insurance and taxes in addition to the monthly lease payments; the lease also gave CitiCapital the right to obtain insurance and charge Fieldtech for the premiums if Fieldtech failed to obtain the required coverage. CitiCaptial attached to its motion for partial summary judgment the affidavit of its employee Wendy Henderson, who averred that as of April 5, 2005, Fieldtech owed CitiCapital $71,399.60 in past due payments, $11,459.91 in late charges, and $12,264.04 in insurance premiums and fees.

39

Beckham's affidavit is no evidence of unauthorized or improper charges. Beckham merely testified that "it has been difficult to determine the amount Fieldtech should actually owe under the lease," not that the amounts paid by Fieldtech actually went to pay unauthorized or improper charges; at the very most, Beckham only speculates that the payments *might* have gone towards improper charges. Speculation is not evidence. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004). Moreover, Beckham's affidavit shows that Fieldtech did not even make the explicitly authorized and agreed-to net lease payments of $3,528.85 per month. Over the twelve months that Fieldtech made lease payments, it should have paid $42,346.20; the payments listed in Beckham's affidavit total $38,199.80. Because the money Fieldtech paid to CitiCapital did not cover the monthly lease payment, no money was left over for CitiCapital to apply to allegedly improper or unauthorized charges.

We therefore hold that Fieldtech failed to raise a fact issue on its allegation of improper and unauthorized charges and that CitiCapital conclusively proved that Fieldtech was in default under the lease agreement and owed CitiCapital the amounts recited in Henderson's affidavit. Thus, the trial court did not err by granting CitiCapital's no-evidence motion for summary judgment on Fieldtech's breach of contract claim and its traditional motion on CitiCapital's counterclaim to enforce the lease.

### c.    Liability of guarantors

Nelms and Mills argue that because there are fact issues regarding the enforceability of the lease, CitiCapital is not entitled to summary judgment on Nelms's and Mills's guarantees because if an underlying debt is unenforceable and the principal debtor has no liability, the guarantor likewise has no liability. *See Hercules Exploration, Inc. v. Halliburton Co.*, 658 S.W.2d 716, 724 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.) ("The guarantor's liability is measured by the principal's liability.").  Fieldtech offers no other argument regarding the summary judgment against Nelms and Mills on their guarantees. Because we have held that the lease was enforceable as a matter of law and that the trial court did not err by granting summary judgment in favor of CitiCapital against Fieldtech, we also hold that the trial court did not err by granting summary judgment against Nelms and Mills on their guarantees.

### d.    Conclusion

Having determined that the trial court did not err by granting CitiCapital's no-evidence and traditional motions for summary judgment, we overrule Appellants' second issue.

## Conclusion

Having sustained Appellants' first issue and overruled their second issue, we affirm the trial court's summary judgments in favor of CitiCapital, reverse

41

its summary judgments in favor of Component Control, and remand Fieldtech's

claims against Component Control for further proceedings.


ANNE GARDNER
JUSTICE

PANEL:  DAUPHINOT, HOLMAN, and GARDNER, JJ.

DELIVERED: August 7, 2008