02-09-051-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00051-CV

 

 


 
 
 GAME SYSTEMS, INC. A/K/A TEXAS GAME SYSTEMS
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 FORBES HUTTON LEASING, INC. AND GAMETRONICS GAMING EQUIPMENT
 LIMITED; AND ROBERT HOUCHIN
 
 
  
 
 
 APPELLEES
 
 


 

 

------------

FROM THE 236th
District Court OF tarrant COUNTY

------------

MEMORANDUM
OPINION[1]

----------

          In
nineteen issues, Game Systems, Inc. a/k/a Texas Game Systems appeals from the
trial court’s denial of its motion for summary judgment against and the grant
of summary judgment for Forbes Hutton Leasing, Inc. (Leasing), Gametronics
Gaming Equipment Limited (Tronics), and Robert Houchin (Houchin) (collectively
Appellees).  We affirm in part and reverse in part.  Because we hold that the
trial court erred by granting summary judgment on Leasing’s claim for breach of
a loan royalty agreement and on Game Systems’s usury claim, we reverse the
trial court’s summary judgment as to those claims.  We remand the case to the
trial court for further proceedings on these claims.  Because we hold that the
trial court erred by awarding unconditional appellate attorney’s fees to
Tronics and Leasing, we reverse the judgment of appellate attorney’s fees.  Because
we hold that the trial court did not err by granting summary judgment on the
remaining claims, we affirm the trial court’s judgment as to those remaining
claims.

I. 
Background

          In
2001, Johnny Weaver and Houchin began doing business together as Texas Gaming
Systems and ultimately incorporated Game Systems, Inc. (Game Systems).  Weaver
and his wife were named directors.  Houchin was hired as president, and Mark Olmstead
was hired as vice president.  In 2002, Weaver, Houchin, Olmstead, and another
person not involved in these proceedings formed Entertainment Merchandising
Technology, LLC (EMT).

          In
2003, Game Systems entered into a licensing agreement with Tronics, as set out
in a “letter of intent,” to develop software for use in Game Systems’s
terminals.  In the trial court below, the parties produced and relied on
different versions of this letter of intent, both stating the same effective
date and signed by the same parties—Houchin, Olmstead, and Fernando Di Carlo,
president of Tronics.  Each version has an attached “Schedule B,” initialed by
Houchin and Di Carlo but not Olmstead, but the Schedule Bs produced are not
identical.  At a hearing in the trial court, Di Carlo testified that he could
not be sure which version of Schedule B was actually attached to the final
fully executed and signed letter of intent.

          In
July 2003, EMT filed a trademark application for Hello Money, which the
application describes as prepaid phone cards.  Game Systems began developing a
sweepstakes, called Hello Money, in which customers purchased calling cards,
which enabled them to play a sweepstakes game.

          As
a part of its business, Game Systems built “sweepstakes validation terminals,”
cabinets in which computers were placed for customers to play sweepstakes
games.  Game Systems placed these terminals with distributors.

          In
2004, Game Systems began receiving outside funding, the source of which was
contested in the trial court.  Game Systems contended that this money came from
Tronics; Leasing asserted that the money came from a different entity,
Forbes/Hutton Financial Corp. (Financial).  As with the letter of intent, the parties
produced two different versions of a loan document that are remarkably similar. 
Both versions of the “loan royalty agreement” cover the same subject matter,
provide the same loan amount on substantially the same terms for the same
purpose, and have the same stated effective date.  Game Systems produced a loan
royalty agreement (LRA1) between Financial and Tronics, signed by Di Carlo and
Arnold Milan, chairman and CEO of Financial, and witnessed by a third party.  Leasing
produced a different loan royalty agreement (LRA2), which is substantially the
same as LRA1 but names both Game Systems and Tronics as borrower rather than
just Tronics and was signed by Milan, Di Carlo, and Houchin on behalf of Game
Systems.  Unlike LRA1, LRA2 does not bear the signature of a third party
witness to the signatures of Milan, Di Carlo, and Houchin.  Under both
agreements, Financial agreed to lend $3,000,000, dispersed in weekly
increments, to build and install 2,000 terminals to run the Hello Money
software.  Both versions contain a provision for repayment out of game revenue
as well as an agreement to pay Financial a percentage of gross revenues from
the terminals after the loan repayment.  Neither version provides the signing
date, but both versions state that the agreement was “made effective as of” May
7, 2004.

          In
September 2004, Houchin filed a patent application in his name as the inventor
of a “[m]ethod and [a]pparatus for [c]onducting a [s]weepstakes.”  The
application states that it is a continuation of a patent application that had
been previously filed on November 4, 2003.

          On
November 17, 2004, Houchin resigned from Game Systems and transferred his
interest in the company, if any, to Di Carlo as trustee.  Two days later,
Houchin filed a “Certificate of Ownership For Unincorporated Business or
Profession” in the Assumed Name Records in Tarrant County; the certificate
states that he owns a limited partnership called Gametronics of Texas.

          In
February 2005, Game Systems signed a one-year distributor agreement with Seven
Sky Inc., an Alabama limited liability company.  Under this agreement, Game
Systems appointed Seven Sky as an agent to “distribute, promote[,] and conduct”
Game Systems’s “promotional phone card system” using Class II “games and game devices.”

          In
March 2005, Leasing and Tronics sent cease and desist letters to some of Game Systems’s
distributors, including Seven Sky, demanding that they turn over to Leasing the
machines and all funds owed to Game Systems.  Leasing designated Houchin as its
agent in Texas for the purpose of repossessing Hello Money terminals covered by
a lease agreement between Game Systems and Leasing.  Game Systems disputed the
validity of the lease at trial.

          The
lease, like LRA2, does not indicate the date it was signed but states an
effective date of July 19, 2004.  The lease states that Leasing owned “certain
equipment, goods and chattels as described in Schedule ‘A,’” which describes
the equipment as “2[,]000 Hello Money Sweepstakes Validation Terminals.” 
Leasing agreed to lease the equipment to Game Systems “at the rates set out in
Schedule ‘B.’”  Schedule B sets a monthly lease rate of ten dollars per month.  The
lease further provides that “[t]he [e]quipment shall at all times remain the
property of [Leasing] . . . until the repayment of the principal as stated in
the Loan Royalty Agreement signed May 7[,] 2004” and that “until such time,
[Game Systems’s] interest in the [e]quipment will be as renter only.”  The
lease does not specify the parties to the loan royalty agreement referenced,
nor does it specify whether the 2,000 terminals covered by the lease are the
terminals that Game Systems had already built, the 2,000 terminals that Game
Systems was supposed to build with funds provided under the loan royalty
agreement, or other terminals that Leasing had built and provided to Game
Systems.  The lease was signed on behalf of Game Systems by Houchin.  In the
trial court, Game Systems contended that it had not received a copy of the
lease until after Houchin had left the company and that it “has in fact always
owned and manufactured its own terminals and has never leased any equipment.”

          On
March 17, 2005, Leasing and Tronics filed suit against Game Systems, seeking a
temporary restraining order and a temporary injunction.  They also asserted
claims for breach of contract, conversion, theft of intellectual property, and an
accounting and sought a declaratory judgment that Game Systems had no right to
use the software and that Leasing had the right to take possession of the
terminals.  Game Systems filed a countersuit for breach of fiduciary duty,
fraud, tortious interference with contract, conversion, breach of contract,
usury, misappropriation of trade secrets, and an accounting.

          Game
Systems also sued Houchin as a third-party defendant.  Houchin filed an answer
asserting various defenses and affirmative defenses.  He also countersued Game
Systems for indemnity.  At some point, the cause was stayed while Game Systems
went into and then out of bankruptcy.  During the bankruptcy proceedings, Game
Systems removed the state action to the bankruptcy court.  After dismissing the
bankruptcy action, the bankruptcy judge remanded the state case back to state
district court.

          Houchin
moved for traditional summary judgment on his affirmative defenses and a no-evidence
summary judgment on Game Systems’s claims against him.  Leasing and Tronics
moved for traditional summary judgment on their claims for breach of contract
and on Game Systems’s claim for usury.  They also moved for no-evidence summary
judgment on all of Game Systems’s claims.  They subsequently filed supplemental
summary judgment evidence, which included an assignment by Financial to Leasing
of Financial’s claim “arising out of or relating to” LRA2.  The assignment was
signed “on or about June 5, 2008 to be effective January 1, 2008.”

          Game
Systems moved for no-evidence summary judgment on all of Houchin’s affirmative defenses. 
It also moved for no-evidence summary judgment on its own claim for breach of
fiduciary duty against Tronics and Houchin.

          The
trial court granted Houchin’s motion for summary judgment without specifying
the grounds.  The trial court also granted summary judgment for Leasing on its
claim for breach of the lease and for Tronics on its claim for breach of the loan
royalty agreement and entered a take nothing judgment on all of Game Systems’s
claims and defenses.  The trial court denied Game Systems’s summary judgment
motions.

 

II. 
Standard of Review

A.  Traditional
Summary Judgment

          We
review a summary judgment de novo.[2]  We consider the evidence
presented in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
evidence contrary to the nonmovant unless reasonable jurors could not.[3] 
We indulge every reasonable inference and resolve any doubts in the nonmovant’s
favor.[4]  A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim.[5]

          A
plaintiff is entitled to summary judgment on a cause of action if it
conclusively proves all essential elements of the claim.[6] 
A defendant is entitled to summary judgment if it conclusively negates at least
one essential element of the plaintiff’s cause of action.[7] 
A defendant is entitled to summary judgment on an affirmative defense if the
defendant conclusively proves all the elements of the affirmative defense.[8] 
To accomplish this, the defendant-movant must present summary judgment evidence
that conclusively establishes each element of the affirmative defense.[9]

B.  No-Evidence
Summary Judgment

          After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s claim or
defense.[10]  The motion must
specifically state the elements for which there is no evidence.[11] 
The trial court must grant the motion unless the nonmovant produces summary
judgment evidence that raises a genuine issue of material fact.[12]

          When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging every reasonable inference and
resolving any doubts against the motion.[13]  We review a no-evidence
summary judgment for evidence that would enable reasonable and fair-minded
jurors to differ in their conclusions.[14]  We credit evidence
favorable to the nonmovant if reasonable jurors could, and we disregard
evidence contrary to the nonmovant unless reasonable jurors could not.[15] 
If the nonmovant brings forward more than a scintilla of probative evidence
that raises a genuine issue of material fact, then a no-evidence summary
judgment is not proper.[16]

III. 
Analysis

          Game
Systems brings nineteen issues on appeal.  In Game Systems’s first issue, it
makes the general assertion that the trial court erred by granting summary
judgment to Appellees.  There are two methods of phrasing issues or points to
complain about trial court error in granting summary judgment.  An appellant
may raise a single issue that complains, “The trial court erred in granting the
motion for summary judgment”; such an issue allows the appellant to brief all
possible grounds upon which summary judgment should have been denied.[17] 
This issue is commonly known as a “Malooly issue.”  Alternatively, an
appellant may list as a separate issue each ground that the movant failed to
prove as a matter of law and upon which the trial court might have based its
judgment.[18]

          Game
Systems appears to do both.  Instead of one issue supported by arguments
attacking each ground for summary judgment, Game Systems asserts a Malooly
issue and then also asserts separate issues attacking each ground.  Game
Systems does not have a separate argument section specifically supporting the Malooly
issue.  We consider below the arguments that Game Systems actually briefed.  To
the extent that Game Systems asserts under this issue any arguments not argued
elsewhere in its brief, this issue is overruled.[19]

A. 
Game Systems’s Breach of Fiduciary Duty Claim

          In
its second issue, Game Systems argues that the trial court erred by granting
summary judgment on its breach of fiduciary duty claims against Appellees because
a fact issue exists as to whether they breached the duty of loyalty and whether
the breach injured Game Systems or benefitted Appellees.  In its petition, Game
Systems alleged that Houchin and Di Carlo breached their fiduciary duties to
Game Systems and that Tronics and Leasing knowingly participated in these
breaches.

1.  Against
Leasing

          In
Tronics and Leasing’s joint motion for summary judgment on Game Systems’s
breach of fiduciary duty claim, they argued that there was no evidence that
Houchin and Di Carlo breached a fiduciary duty to Game Systems, that a breach
resulted in injury to Game Systems or benefited Houchin or Di Carlo, or that
Leasing or Tronics knowingly participated in any breach.  In response, Game
Systems asserted that Di Carlo had the burden of producing evidence to show
that he did not breach his fiduciary duty.

          Leasing
did not have a fiduciary relationship with Game Systems, and Game Systems did
not allege that Leasing owed it a fiduciary duty.  Leasing could nevertheless
be liable on a breach of fiduciary duty claim if it knowingly participated in a
breach of duty by a fiduciary.[20]  But Leasing asserted in
its no-evidence motion that Game Systems had no evidence that it had knowingly
participated in any breach of fiduciary duty.  Game Systems was therefore
required to point out evidence that raised a fact issue on this element of its
claim.[21]  Game Systems did not do
so.  Thus, the trial court correctly granted summary judgment for Leasing on
this claim.

2.
Against Tronics

          Like
Leasing, Tronics alleged that there was no evidence that it had knowingly
participated in a breach of fiduciary duty.  Tronics also asserted that there
was no evidence that its president, Di Carlo, breached any fiduciary duty to
Game Systems.  In response, Game Systems argued that Tronics had the burden of
producing evidence that transactions between Di Carlo and Game Systems were
fair and equitable to Game Systems.

          Game
Systems argued that Di Carlo owed it a fiduciary duty because he served as one
of its directors.  If a director causes a corporation to engage in a transaction
in which he has an interest,[22] this can (though not
necessarily) constitute a breach of his fiduciary duty to the corporation.[23] 
If the validity of this transaction is challenged, the director has the burden
of establishing that the transaction is fair to the corporation.[24] 
But a person does not have to establish the fairness of a transaction with a
corporation if the person does not owe a fiduciary duty to the corporation, and
of course, if a person does not owe a fiduciary duty to the corporation, then
engaging in the transaction cannot constitute a breach of such a duty.[25]

          Tronics
is not the company alleging that its president, Di Carlo, breached a fiduciary
duty—Game Systems is.  Before Di Carlo had any burden to justify a transaction
in which he was interested (and before Tronics has any burden to justify a
transaction it engaged in with Game Systems through Di Carlo), Game Systems
first had to establish that Di Carlo owed it a fiduciary duty.  Game Systems
stated in its pleadings that Di Carlo was a “former member of the board of Game
Systems.”  But Game Systems produced no evidence that Di Carlo had ever served
on the board of directors for Game Systems.

          Game
Systems did, however, produce evidence that Di Carlo had briefly served on an
advisory committee created by an operating agreement.  This agreement among
Houchin, his wife, Weaver, his wife, Olmstead, and Houchin’s son-in-law Chris Canard
set up operating procedures for Game Systems to resolve unspecified disputes
about the business while Houchin and Weaver attempted to negotiate Houchin’s purchase
of Weaver’s interest in the company.[26]  The advisory board of
which Di Carlo was named a member was to meet once a month, or more if
required, to “discuss and decide the current and future business” of Game
Systems.  The agreement, executed on November 12, 2004, expired by its own
terms after sixty days.

          Assuming
that this agreement created a fiduciary relationship between Di Carlo and Game
Systems,[27] nothing in the operating
agreement mentions Tronics or shows that Di Carlo had signed the agreement while
acting as a representative of Tronics rather than as an individual, and Game
Systems did not point out any evidence that it contended raised a fact issue
about whether he was acting for Tronics.[28]  Furthermore, even if Di
Carlo had been acting on behalf of Tronics, Game Systems did not allege which
acts, if any, Di Carlo took during the sixty days that the agreement was in
effect that constituted a breach of fiduciary duty, and Game Systems’s summary
judgment response pointed to no evidence raising a fact issue on the matter. 
Nor did Game Systems assert any argument (or any evidence in support of such an
argument) that any duty that Di Carlo owed, on behalf of Tronics or otherwise,
would continue after the termination of the operating agreement.[29]

          Houchin
transferred his interest in Game Systems to Di Carlo “as trustee,” but he did
not do so until November 17, 2004.  Houchin testified at the temporary
injunction hearing that the transfer was intended to put his ownership interest
“in trust with Gametronics.”  A shareholder, however, generally does not owe a
fiduciary duty to a corporation, and although a majority shareholder can owe a
fiduciary duty to the corporation,[30] nothing in the record
shows that the transfer of interest made Di Carlo or Tronics the majority
stockholder of Game Systems.  Thus Game Systems pointed to no evidence
suggesting that Tronics owed a fiduciary duty to Game Systems or the other
shareholders, even after the transfer, much less evidence that Tronics breached
that duty.  And in the absence of evidence that Tronics owed it a fiduciary
duty, as with its claim against Leasing, Game Systems was required to point out
evidence that raised a fact issue on whether Tronics knowingly participated in
a breach of fiduciary duty.  Game Systems did not do so.  Accordingly, the
trial court correctly granted the no-evidence motion for Tronics on this claim.

3.  Against
Houchin

          Houchin
filed a traditional and a no-evidence motion for summary judgment on Game Systems’s
claims, including a no-evidence motion on Game Systems’s breach of fiduciary
duty claim against him.  Houchin asserted that there was no evidence that he
had breached a fiduciary duty to Game Systems or that any such breach resulted
in an injury to Game Systems or a benefit to himself.  In its response, Game
Systems asserted that Houchin had the burden of producing evidence showing that
he did not breach his fiduciary duty to Game Systems.  It correctly noted that,
as stated above, when a fiduciary has benefitted from a transaction with the
beneficiary, the burden shifts to the fiduciary to show that the transaction
was fair and equitable.[31]

          Houchin
asserted in his motion that there was no evidence that he had benefitted from
or that Game Systems had been injured by any such transaction.  Game Systems
therefore had the burden to respond with some evidence showing that while
Houchin owed it a fiduciary duty, he engaged in a transaction with Game
Systems, or caused it to engage in a transaction, in which he was interested.[32]
 Until Game Systems met that burden showing the existence of such a
transaction, Houchin had no burden to show that such transaction was fair and
equitable to Game Systems.[33]

          In
its response, Game Systems referred the trial court to facts presented in
paragraph twenty-two of its response.  But in paragraph twenty-two, Game
Systems did not point out any evidence that Houchin was interested in any
transaction of Game Systems.  Thus, the burden never shifted to Houchin to prove
that he did not benefit from any such transaction or that Game Systems was not
harmed by it.  Game Systems did not make any other argument in its response and
pointed to no evidence about whether Houchin breached his fiduciary duty in any
way other than benefitting from a transaction with Game Systems.

          In
its brief on appeal, Game Systems states that “there is evidence raising a fact
issue as to whether Appellees breached fiduciary duties” to Game Systems.  Our
inquiry does not focus on whether evidence exists to support Game
Systems claim; instead, we look to see if Game Systems produced that evidence and
pointed it out to the trial court in response to the no-evidence motion.[34]
 Because Game Systems did not, the trial court did not err by granting summary
judgment for Houchin on Game Systems’s breach of fiduciary duty claim against
him.  We overrule Game Systems’s second issue.

B. 
Game Systems’s Fraud Claims

          Game
Systems’s third, fourth, and fifth issues relate to Game Systems’s fraud
claims.  In its fourth issue, Game Systems asserts that the trial court erred
by granting summary judgment for Appellees on its fraud by misrepresentation
claim.

          In
their no-evidence summary judgment motions, Houchin, Tronics, and Leasing
asserted that Game Systems had no evidence that they (1) made a material
representation to Game Systems, (2) which was false; (3) which they knew was
false or that was made recklessly as a positive assertion without knowledge of
its truth; (4) which was intended to be relied upon; (5) which Game Systems did
rely upon; (6) and which caused Game Systems injury.

          In
its response to Tronics and Leasing’s motion, Game Systems pointed out evidence
that it contended raised a fact issue on each challenged element, although it
did not specify which evidence related to which element.  Game Systems directed
the trial court’s attention to the two versions of the letter of intent, LRA1,
LRA2, and the equipment lease.  Game Systems also pointed out the following
statements in the affidavit of Weaver:

An altered Letter of
Intent was attached to [Tronics] and [Leasing’s] Original Petition. . . . That
altered Letter of Intent attempts to include the terms of paragraph (7) with
the schedule B license payments.  Significantly, without this addition, [Tronics]
cannot support its claims in this lawsuit.

 

. . . 

 

On December 6, 2004,
I received a fax of [LRA2].  [LRA2] is identical to [LRA1] aside from the
inclusion of Game Systems as the “borrower” under rather than [Tronics] and the
fact that it was signed by Houchin as president of Game Systems as well as
Milan on behalf of [Financial] and Di Carlo on behalf of [Tronics].  I was
aware of the fact that [Tronics] had obtained money from [Financial], but was
never informed that Game Systems was made a borrower in any agreement with [Financial]. 
Houchin dealt with [Financial] while he was president of Game Systems.

 

 . . . 

 

On December 6, 2004,
I was faxed a copy of a document headed “Equipment Lease (Ontario)” . . . which
states that it is “made effective” July 19, 2004.  This is the first time I
heard of the Equipment Lease.  This document is signed by Houchin, allegedly
for Game Systems, with an entity listed as [Leasing] (an entity no one at Game
Systems had ever heard of).

 

. . . 

 

The Equipment Lease
contains many mis-statements, one of which is that [Leasing] owned Game Systems’[s]
products and that [Leasing] provided equipment to Game Systems.  No equipment
was ever provided under the “lease” by [Leasing] to Game Systems.

 

. . . 

 

This lease agreement
was no more than fiction; although the Equipment Lease purportedly gave [Leasing]
ownership of the 2[,]000 Hello Money Sweepstakes Validation Terminals, Game
Systems always owned and manufactured its own equipment and never leased any
equipment from any person or entity.  In fact, the lawyer who prepared the
incorporation documents for [Leasing] testified that the only purpose for the
corporation was to hold a bogus UCC-1 form in order that some person or entity
could ostensibly show a greater interest in the Hello-Money equipment.

 

          Game
Systems used the same evidence in response to Houchin’s motion, plus one additional
paragraph from Weaver’s affidavit:  “Houchin fabricated production schedules. 
These production schedules showed that many more Hello Money consoles had been
produced than were actually in existence.”  Game Systems also attached the
production schedules referenced in this paragraph as evidence of fraud by
Houchin.

          Neither
Weaver’s affidavit nor the documents referenced in the affidavit show a false
representation on which Game Systems relied to its detriment.[35] 
Game Systems pointed out instruments allegedly executed by Houchin acting for
Game Systems, but it did not point out evidence that Houchin intended Game
Systems to rely on the instruments or that it did rely on them.  Game Systems
did not point out any evidence that Houchin made any false representations to
Game Systems on which Game Systems relied.  Even reading Weaver’s affidavit
liberally to include an accusation that some of the instruments were executed
after Houchin left the company, Game Systems pointed out no evidence that it
relied to its detriment on any statements in those instruments.

          As
for Tronics and Leasing, the evidence noted by Game Systems did not include any
false representation by either party on which Game Systems relied to its
detriment.  That two different versions of the letter of intent and two
different versions of the loan royalty agreements were in existence does raise
questions about whether Appellees were remarkably careless in drafting business
documents (one can hardly argue, for example, that the identity of the borrower
in a $3,000,000 loan transaction is a trivial detail) or whether they were
engaged in some dishonest activity.  But without more, these documents do no
more than create surmise or suspicion,[36] and, importantly, they
do not show that Game Systems relied on them to its detriment.  Houchin, then
acting for Game Systems, signed each instrument, and Game Systems pointed out
no evidence that Houchin relied on any misrepresentation by Tronics or Leasing
in agreeing to execute the instruments.  Game Systems pointed out no evidence
that any one else acting for Game Systems was induced to take any action or to
refrain from taking any action because of representations by Houchin, Tronics,
or Leasing.

          Game
Systems argues that the evidence raises a fact issue as to whether Houchin
misrepresented the nature and purpose of the money from the loan agreements
because Weaver and Olmstead both testified that Houchin represented to them
that the money received from Tronics was from a third party investor whom
Tronics was liable for repaying.  But Game Systems did not note any evidence of
its alleged detrimental reliance on such statements by Houchin.  And
furthermore, Olmstead’s testimony was not pointed out to the trial court in
response to Appellees’ no-evidence motion; only Weaver’s testimony was.  The
only relevant statements in Weaver’s affidavit noted by Game Systems are that
Weaver “was aware of the fact that [Tronics] had obtained money from [Financial],
but was never informed that Game Systems was made a borrower in any agreement
with [Financial].  Houchin dealt with [Financial] while he was president of
Game Systems.”  This is not an assertion that Houchin affirmatively told Game
Systems that the money came from Tronics rather than Financial, and while it is
some evidence of a failure by Houchin to disclose LRA2 to Weaver, it is not
evidence that Game Systems relied to its detriment on Houchin’s failure to
disclose to Weaver the existence of LRA2.

          Game
Systems also argues that it raised a fact issue about whether Houchin
misrepresented the number of Hello Money terminals in existence and the amount
that should be paid to Tronics under the letter of intent.  It contends that
Houchin created false production schedules to justify paying unearned royalty
payments to Tronics.  The only evidence noted by Game Systems in its response
relating to the production schedules is a statement in Weaver’s affidavit that
“Houchin fabricated production schedules” and a copy of the production
schedules.  Game Systems pointed out no evidence that Game Systems relied on
any false production schedules to its detriment.

          Finally,
Game Systems argues that a fact issue exists as to whether Di Carlo
misrepresented the quality of the software that Tronics could and did deliver
to Game Systems.  But it pointed out no evidence of such a fact in its response
to Tronics’s no-evidence motion.  Accordingly, we overrule Game Systems’s
fourth issue.

          In
its fifth issue, Game Systems argues that the trial court erred by granting
summary judgment on all of its fraud claims when Appellees failed to challenge
all of its fraud theories.  Game Systems asserts that fraud embraces “all means
resorted to by one individual to gain an advantage over another by false
suggestions or suppression of truth, including all surprise, tricks, cunning,
dissembling and unfair way by which another is cheated.”[37] 
It asserts that its petition alleged types of conduct involving fraud by
non-disclosure or fraud committed through some form of artifice, trickery,
cunning, and dissembling.  And, Game Systems argues, because Appellees
“restricted their no[-]evidence motions to challenging [Game Systems’s] claims
based on fraud by misrepresentation,” Appellees failed to move for summary
judgment on all of Game Systems’s fraud claims.

          We
agree that “[t]he gist of fraud is successfully using cunning, deception, or
artifice to cheat another to the other’s injury.”[38]
 But to prevail on a common law fraud claim, the plaintiff must prove that the
defendant intentionally misled or deceived the plaintiff, either by making a false
misrepresentation or by failing to disclose what the defendant had a duty to
disclose, and that the plaintiff relied on the misrepresentation or
nondisclosure.[39]  Appellees challenged
these elements in their no-evidence summary judgment motions.  Game Systems
therefore had a duty to produce some evidence in support of these elements, and
we have held that it failed to point out evidence that it relied on any act of
deceit by Appellees.  Accordingly, we overrule Game Systems’s fifth issue.

          In
its third issue, Game Systems argues that the trial court erred by refusing to
grant it summary judgment on its breach of fiduciary duty claims against
Appellees.  Because we have held that the trial court did not err by granting
no-evidence summary judgment for Appellees on Game Systems’s breach of
fiduciary duty claims, we overrule this issue.

C. 
Leasing’s Breach of Contract Claim Based on LRA2

          In
its sixth issue, Game Systems asserts that the trial court erred by granting
summary judgment on Leasing’s claim that Game Systems breached LRA2 because (1)
a fact issue exists as to whether LRA2 is a product of Appellees’ fraud, (2)
Leasing did not establish its right to judgment as a matter of law, and (3)
Leasing lacks standing to recover for breach of LRA2.

          Game
Systems first argues that a fact issue exists as to whether LRA2 is a product
of Appellees’ fraud.  More specifically, it argues that there is a fact issue
as to Houchin’s breach of duty and fraud and whether Tronics, Financial, and
Leasing colluded with Houchin to defraud Game Systems.  We have overruled Game Systems’s
issue with respect to its fraud claim, and we therefore reject Game Systems’s
argument that an issue of fact as to fraud precluded summary judgment for
Leasing on its breach of contract claim.

          Game
Systems also argues that Leasing did not conclusively establish its right to
judgment as a matter of law because the evidence Leasing relies upon is taken
out of context, does not support Leasing’s position, and has to be disregarded
because it conflicts with Olmstead’s and Weaver’s testimony that Game Systems
did not know of LRA2’s existence until after Houchin had resigned.  Game
Systems contends that Olmstead’s testimony that Game Systems owed Tronics $1.95
million was based on Olmstead’s “understanding that [Game Systems] owed the
money to Tronics pursuant to specific terms, which he could not remember at the
time, that Houchin struck with Tronics.”  Game Systems argues that Olmstead’s
testimony “does not conclusively establish as a matter of law that [LRA2] is a
valid and enforceable contract”; rather, “Olmstead repeatedly testified that
[Game Systems] did not know about the execution” of LRA2 until after Houchin’s
resignation and that Game Systems “believed that [LRA2] was a sham
transaction.”

          The
elements of a breach of contract claim (which Leasing did not state in its summary
judgment motion) are “(1) the existence of a valid contract, (2) performance or
tendered performance by the plaintiff, (3) breach of the contract by the
defendant, and (4) resulting damages to the plaintiff.”[40]
 To be entitled to summary judgment on this claim, Leasing was required to
submit evidence establishing a prima facie case on each of these elements.

          In
its motion for summary judgment, Leasing stated that Financial advanced to Game
Systems a sum of “at least $2,260,847.87” but that Game Systems failed to make
payments to Financial as required under LRA2 and the equipment lease.  Leasing referred
the court to pages from a deposition given by Olmstead in a bankruptcy
proceeding; Leasing claimed that in this deposition, Olmstead admitted that
Game Systems owed the money.  Leasing asserted that it had repossessed 170 of
the terminals, which had a fair market value “on [sic] not more than $1,500.00
per machine that was the acquisition cost of the equipment,” and it referred
the court to LRA2, the deposition of Richard Graham, and an order in the
Alabama case.  Leasing then stated that

[t]he summary
judgment evidence establishes, as a matter of law that [Game Systems] has did
not [sic] make the payments to Forbes Hutton as required by the parties[’]
agreement.  [Game Systems] has admitted in the testimony of its Corporate
Representative Mark Olmstead that the sum of $1,953,745.00 remains unpaid on
the principal advanced to it under [LRA2].  [Game Systems] admits it received
the funds and accepted the benefits of their use.  [Tronics] stipulates that
[Tronics] was acting on behalf of Forbes in forwarding the funds in question to
[Game Systems].  The summary judgment evidence establishes that the 170
terminals, which Forbes was able to repossess in Alabama, had a value not to
exceed $1,500.00 per machine (their original acquisition cost).  Accordingly,
applying a credit to [Game Systems] of $255,000 for the recovered machines
leaves an unpaid outstanding princip[al] balance of $1,728,745.00.

 

          Thus,
with respect to showing the existence of a valid contract, Leasing relied on
LRA2, which Leasing attached to its motion.  To show performance, breach, and
damages, Leasing relied on Olmstead’s deposition, attached to the motion, in
which he testified that Game Systems had received money, purportedly under a
loan agreement, and that $1,953,745 of the advanced money had not been repaid. 
But in his testimony, Olmstead only testified that Game Systems had received
money from Tronics, not from Financial or from Leasing.  Olmstead specifically
stated that “[a]s far as we are concerned, our agreement was with [Tronics]”
and “[t]hat’s where we got the money from.”  Nowhere in his testimony did
Olmstead admit or suggest that Game Systems had received money directly from
Financial.  Olmstead stated that if Tronics wanted Game Systems to pay the
money to Financial instead of directly to Tronics, it would, and he stated that
if he were shown documents showing that “Forbes Hutton” had given the money for
the loan to Tronics, “[i]t would obviously show where [Tronics] got that money
from.”  But he never testified that Game Systems received any money from
Leasing under LRA2.[41]  Without some other
evidence to show that Financial tendered money to Game Systems under LRA2 and
that it suffered damages resulting from Game Systems’s failure to repay the
money, Leasing was not entitled to summary judgment on its claim that Game
Systems breached LRA2.[42]

          After
filing its summary judgment motion, Leasing supplemented its motion with
additional evidence in the form of an assignment from Financial to Leasing of
its breach of contract cause of action.  This assignment was executed after
Leasing had filed suit against Game Systems.  In this assignment, executed by Roque
Isla (president of Financial) on behalf of both Financial and Leasing, Isla
stated that Financial had advanced $2,268,847.37 to Game Systems and that this
money had not been repaid.  This statement, made by an interested party and
contradicted by Olmstead’s testimony, does no more than raise a fact issue.[43]

          Leasing
also attached a document purporting to be a “payment detail” from Game Systems,
which includes a payment to “Forbes Hutton Financial Corp.”  But the memo line
of that entry states, “Notes Payable–Gametronics.”  Thus, this entry is as
consistent with Olmstead’s suggestion that Gametronics obtained the money it
loaned to Game Systems from Financial (and Financial’s inquiries during the
bankruptcy proceeding about whether Game Systems would be willing to repay the
loan money to Financial rather than Tronics) as it is with Financial’s
assertion that it advanced money to Game Systems directly under LRA2.

          Because
Leasing failed to submit sufficient evidence to establish all essential
elements of its breach of contract claim, the trial court erred by granting summary
judgment for Leasing on the claim.[44]  We therefore sustain
this part of Game Systems’s sixth issue.

          Finally,
in the remainder of its sixth issue, Game Systems argues that the summary
judgment for Leasing must be reversed because Leasing lacks standing to recover
for breach of contract based on LRA2.  Leasing’s supplemental evidence includes
the assignment by Financial to Leasing and a business records affidavit by
Isla.  Game Systems objected to the affidavit on the ground that “there is no
statement that all of the facts stated in such affidavit are true.”  The trial
court sustained this objection.  Game Systems also objected to the assignment as
hearsay.  The trial court overruled this objection.  The trial court clearly considered
the assignment as summary judgment evidence, noting in the judgment that
Financial had assigned its claim to Leasing.

          Game
Systems asserts that there was no evidence to prove that Leasing had standing
after the trial court sustained Game Systems’s objection to the Isla affidavit
because that ruling eliminated the only witness to sponsor and authenticate the
assignment.  Game Systems further asserts that the trial court should have
sustained Game Systems’s objection to the assignment on hearsay grounds.

          Leasing
contends that any error in admitting the document while sustaining the
objection was harmless because the document was admissible.  The assignment is
a written statement, other than one made by a declarant while testifying at the
hearing, offered into evidence to prove the truth of the matter asserted
(namely, that Financial assigned its rights under LRA2 to Leasing).  As such,
the assignment is hearsay.[45]  The assignment is
admissible, however, under the business records exception.[46]

          Although
the affiant of a business records affidavit must swear to the contents of the
affidavit, the form of affidavit provided in the rules does not require an
express statement in a business records affidavit that all of the facts stated
in the affidavit are true.[47]  The affiant is required
to aver that the record attached to the affidavit is kept in the regular course
of business, that it was the regular course of business for an employee or
representative of the company with knowledge of the act recorded to make the record,
and that the record was made at or near the time of the act or reasonably soon
after.[48]  The affiant must state
that he is “personally acquainted with the facts herein stated.”[49] 
The affiant must also swear that the attached record is the original or an
exact duplicate.[50]

          In
this case, Isla stated his name and his position with Financial.  He stated
that the assignment attached to the affidavit is “a true and correct copy” of
the assignment, that he personally executed the document, and that its execution
was authorized by the directors and shareholders of Financial.  He further
swore that the original of the assignment is maintained at the company’s
offices “in the regular course of its business and it was the regular course of
business for an employee or representative of [Financial], with knowledge of
the act, event, condition recorded to make the record or to transmit
information thereof to be included in such record; and the record was made at
or near the time or reasonably soon thereafter.”  Isla swore to the contents of
the affidavit before a notary public, as required by rules of evidence.[51] 
Isla did not expressly state that he was personally acquainted with the facts
stated in the affidavit, but he does state that he personally executed the assignment
as president of Financial, thereby demonstrating his personal knowledge.  Because
the affidavit meets the requirements of Rule 902(10), the assignment is
admissible under the hearsay exception in rule 803(6).  The trial court should
have overruled Game Systems’s objection to the affidavit, and it had the
authority to do so even after it had originally sustained it.[52] 
The trial court therefore did not abuse its discretion by considering the
assignment.  We overrule the remainder of Game Systems’s sixth issue.

D. 
Tronics’s Claim of Termination of the Licensing Agreement

          Tronics
sued Game Systems for declaratory relief, arguing that “[t]he summary judgment
evidence establishes as a matter of law that [Game Systems’s] license to use
the [Tronics] software has terminated” and seeking a declaration to that
effect.  In Game Systems’s seventh issue, it argues that the trial court erred
by granting summary judgment for Tronics on this claim.

          The
letter of intent provides that Game Systems would pay Tronics “a fee for the
license of the technology and related customized work . . . in the amount of
US$315,000 ‘License Fee’ as per schedule ‘B.’”  Two different versions of
Schedule B appear in the record, one provided by Tronics in support of its
motion, and one provided by Game Systems in its response.  Both versions list
four installment payments of $78,750.  The version produced by Tronics
(“Version I”) also lists on Schedule B “*fees re: #7 above”; paragraph seven of
the body of the letter of intent provides for payments by Game Systems of a
percentage of “the win” of each machine.  Thus, under Version I, the revenue
percentage payments constitute part of the license fee.

          The
version produced by Game Systems (“Version II”) requires Game Systems to pay
Tronics the four installment payments as a license fee but does not list the “*fees
re: #7 above” as part of the license fee.  Neither version of the letter of
intent references the other or asserts that it replaces the other.  Both
versions of Schedule B bear the initials of Houchin and Di Carlo.  No other
initials or signatures appear on Schedule B.

          Both
versions of the letter of intent expressly provide Tronics with the right to
terminate the contract under two circumstances: Game Systems’s insolvency or
bankruptcy, or Game Systems’s failure to pay the license fee required under the
agreement.  Tronics did not, however, base its termination of the agreement
solely on this provision.  Tronics stated in its summary judgment motion that
it had terminated Game Systems’s license on March 30, 2005, because Game
Systems “failed entirely or in substantial part to comply with its obligations”
under the letter of intent in that it “failed to pay license fees and other
consideration,” failed to provide Tronics with real-time access to management
and operational information, failed to provide monthly reports, “failed to pay
that portion of licensing fees comprised of winnings from each [t]erminal,” and
failed to operate Tronics’s software in accordance with the law and in a
professional manner that did not have negative effects on Tronics’s operations
and licenses.  Tronics then asked the trial court to enter a declaratory
judgment that it had effectively terminated the license.

          The
trial court granted summary judgment for Tronics declaring that the license was
terminated without specifying the grounds asserted by Tronics on which it had based
its decision.  Game Systems was therefore required to argue on appeal that the
trial court could not have properly granted summary judgment on any of the grounds
asserted by Tronics.[53]

          Game
Systems focuses its argument on the termination provision of the contract,
asserting that the contract only allowed for termination on the happening of
one of the two specified contingencies: (1) its own insolvency or bankruptcy or
(2) its failure to pay the license fee.  Game Systems argues that it was never
adjudicated bankrupt and Tronics did not establish that it was insolvent, and,
therefore, Tronics could not have terminated the contract under the first
contingency.  Game Systems further argues that Tronics could not have
terminated the contract on the second contingency because a fact issue exists
as to whether Game Systems paid the license fee.

          Game
Systems argues that because a fact issue exists as to whether the revenue
percentage payments were part of the license fee, a fact issue also exists as
to whether Game Systems paid the license fee, and summary judgment was therefore
improper.  We agree that a fact issue exists as to which version of Schedule B
is part of the final, executed contract.  But although only one version of the
letter of intent expressly characterizes the revenue percentage payments as a
part of the license fee, both versions require Game Systems to make the
payments.  Game Systems does not dispute that it did not pay the revenue
percentage payments, that it did not provide monthly reports, or that it
disconnected the terminals from the servers and thereby failed to provide real time
information to Tronics.  Game Systems merely argues that because the letter of
intent does not provide that Tronics could terminate the agreement for its
failure to follow these contract provisions, Tronics could not have terminated
the contract.

          But
the letter of intent did not provide that Tronics could terminate the license
agreement only under the two specified contingencies.[54] 
Unless the contract provided otherwise, which it does not, under
well-established principles of contract law, Tronics could terminate the contract
for any material breach of the agreement by Game Systems.[55]

          Game
Systems makes no argument that the breaches alleged by Tronics were not
material.  And the revenue percentage payments, even if not part of the license
fee, are at the heart of the letter of intent; monetary compensation is the
only benefit that Tronics receives under the letter of intent.[56] 
The trial court may have reached its decision by considering the summary
judgment evidence regarding the intention of the parties and concluding that
Game Systems’s failure to make the payments was a material breach and that
Tronics was therefore entitled to terminate the contract.  Game Systems does
not argue that the trial court’s conclusion regarding materiality was erroneous. 
Accordingly, we cannot say that the trial court erred by granting summary judgment
for Tronics on this ground.

          Game
Systems also argues that the trial court erred by granting summary judgment on
Tronics’s claim because there is a fact issue as to whether the letter of
intent was the product of Tronics’s fraud.  Because we have held that the trial
court did not err by granting summary judgment for Tronics on Game Systems’s
fraud claim, we overrule this argument.

          Finally
under this issue, Game Systems argues that the trial court erred by granting
summary judgment because a fact issue exists as to whether Game Systems has an
ownership interest in Tronics’s software.  Tronics asserted in its summary
judgment motion that the evidenced establishes as a matter of law that the letter
of intent does not transfer any ownership of the software to Game Systems.  In
response, Game Systems asserted that the software was defective and that it had
had to spend money to fix the defects, and, therefore, “Game Systems has an
ownership interest in software that [Tronics] provided to the extent that Game
Systems has had to create new games from the [Tronics] software as a result of
[Tronics’s] failure to provide or repair software it provided.”

          But
the only evidence Game Systems produced to this effect are the conclusory
statements[57] in Weaver’s affidavit
that “Game Systems has had to spend, and is continuing to spend, hundreds of
thousands of dollars fixing the broken software” and that a dispute arose among
the parties when it “became apparent that the [Tronics] software was defective,
that [Tronics] was not going to support the software, [and] that hundreds of
thousands of dollars in expenses were going to be incurred by Game Systems as a
result.”  These statements do not raise a fact issue about whether the letter
of intent gives Game Systems an ownership interest in the software.

          On
appeal, Game Systems argues that a fact issue exists as to whether Game Systems
has an ownership interest in the software because Tronics granted Game Systems
a license to use the software and in return, Game Systems paid a license fee.  Game
Systems argues that it therefore had a right to use the software indefinitely
unless some specific provision in the letter of intent allowed Tronics to
terminate the license.

          Game
Systems did not make this argument in the trial court.  On appeal from the
grant of a summary judgment, the nonmovant may raise the issue of legal
sufficiency for the first time on appeal, but any other issue must have been
raised in the trial court in order to serve as a basis for reversal on appeal.[58] 
Furthermore, Lulirama Ltd., the case relied on by Game Systems in
support of its argument that the license gives Game Systems an ownership
interest in the software, does not support this claim.[59]

          That
case does not hold that merely paying a license fee gives the licensee an
ownership interest in the licensed work.  Rather, it notes that under the
federal Copyright Act, an exclusive license can transfer copyright ownership.[60]
 Nothing in the letter of intent suggests, much less establishes, that the
license granted was an exclusive license.  Game Systems also cites Lulirama
Ltd. for the proposition that if the license was a nonexclusive license, it
gave Game Systems the right to use the software indefinitely unless some
specific provision in the agreement allowed Tronics to terminate the license. 
The case actually holds, however, that a nonexclusive license may be
irrevocable if supported by consideration because such license is a contract.[61] 
In other words, because such a license supported by consideration constitutes a
contract, the license is not terminable at will.[62] 
But that case did not hold that such a contract may never be terminated except
as provided in a termination provision in the contract or that it is not
subject to fundamental principles of contract law.[63] 
The court in that case expressly did not reach the issue of who owned the
licensed property.[64]  Accordingly, we are
unpersuaded by Game Systems’s argument.  We overrule Game Systems’s seventh issue.

E. 
Game Systems’s Tortious Interference with Contract Claims

          Game
Systems argues in its eighth issue that the trial court erred by granting
summary judgment on its tortious interference with contract claims against Appellees.

          Appellees
asserted in their no-evidence motions that there was no evidence that Game
Systems had a valid contract, that they willfully and intentionally interfered
with the contract; that the interference was a proximate cause of Game Systems’s
injury; or that Game Systems incurred actual damage or loss.  In response to
Tronics and Leasing’s motion, Game Systems relied on copies of the cease and
desist letters sent by Leasing and Tronics to Seven Sky and other entities, and
a letter naming Houchin as an agent of Leasing for purposes of repossessing
equipment in Texas.  Game Systems also pointed out excerpts from Weaver’s
affidavit stating that after a dispute arose between Game Systems and Tronics
over the software, “persons purporting to be associated with [Leasing] and
[Tronics] began demanding, based on the Equipment Lease, that the distributors
of Game Systems . . . turn over both the machines and all funds owed to Game
Systems directly to [Appellees]” and that “[Appellees] began . . .
demanding that such third parties turn off the machines in violation of their
agreements with Game Systems” on the ground that the software license had been
terminated.  Game Systems further pointed out as evidence this paragraph in
Weaver’s affidavit:

On February 18, 2005,
Game Systems had entered into a distributorship agreement with Seven Sky, Inc.,
an Alabama Corporation . . .  In March of 2005 when [Appellees] were sending
their Cease and Desist Letters, [Appellees] caused Seven Sky, Inc. to begin
paying [Tronics] and/or [Leasing] the percentage of income set out in Exhibit
A-17 and has made no payment to Game Systems since that time.  I believe that
[Tronics] and/or Forbes Hutton began receiving these payments.  Interestingly,
Houchin was named by [Leasing] as its ‘agent of [Leasing] for the limited
purpose of repossessing the Hello Money Sweepstakes terminals covered by the
lease agreement between [Leasing] and [Game Systems].

 

          The
evidence relied upon by Game Systems is not enough to raise a fact issue
sufficient to defeat summary judgment.  The letter naming Houchin as agent is
not evidence of any of the elements of tortious interference, given that he was
only appointed as agent in Texas, that there was no evidence that Game Systems
suffered any damages due to action Houchin took as an agent in Texas, and that
there was no evidence that he actually repossessed anything.  Likewise, Weaver’s
statement of his belief about to whom Seven Sky made payments is no evidence
because it is conclusory; the affidavit does not demonstrate that Weaver has
any personal knowledge of whether the payments were sent to Appellees or to
anyone else.

          Game
Systems did offer evidence (1) of the existence of a contract with Seven Sky, (2)
that Leasing and Tronics sent letters to Seven Sky instructing it to stop
paying Game Systems, and (3) that Game Systems thereafter did not receive any
payments under the contract.  But Game Systems did not produce evidence that
Appellees’ actions caused it to suffer any damages.  Richard Graham, a representative
for Seven Sky, testified by deposition in the bankruptcy proceeding that in
addition to the cease and desist letters, a primary reason he stopped doing
business with Game Systems was that Game Systems set up competing locations in
Alabama.  Game Systems presented no evidence that, had the terminals not been
repossessed, Seven Sky would have continued to operate them.  And importantly,
the agreement with Seven Sky stated that Game Systems was to be compensated
with a percentage of gross profits, but Game Systems produced no evidence that
for the months it received no payments, Seven Sky generated any profits. 
Accordingly, Game Systems produced no evidence on damages.[65] 
The trial court therefore did not err by granting summary judgment for Tronics and
Leasing on this claim.

          In
response to Houchin’s summary judgment motion, Game Systems pointed out the same
paragraph in Weaver’s affidavit about the cease and desist letters and Seven
Sky’s stopping payment to Game Systems, as well as the letter naming Houchin as
agent for Leasing to repossess Leasing’s equipment.  That Houchin was
authorized by Leasing to repossess equipment in Texas is not enough to raise a
fact issue as to whether Houchin interfered with a valid contract that Game
Systems had with another party.  The trial court properly granted Houchin’s
no-evidence summary judgment motion on this claim.  We overrule Game Systems’s
eighth issue.

F. 
Game Systems’s Conversion Claim

          In
its ninth issue, Game Systems asserts that the trial court erred by granting
summary judgment on its conversion claim against Houchin, Tronics, and Leasing.

          Appellees
asserted in their summary judgment motions that there was no evidence that they
wrongfully exercised dominion or control over Game Systems’s personal property
and no evidence that Game Systems suffered injury from any such act.  In
response to Tronics and Leasing’s motion, Game Systems relied on the following
evidence:  copies of the cease and desist letters sent by Tronics and Leasing,
the letter authorizing Houchin to repossess Leasing’s equipment in Texas, and two
paragraphs of Weaver’s affidavit.  The first paragraph is the same one Game
Systems relied on in support of its tortious interference claim, alleging that
the cease and desist letters caused Seven Sky to stop paying Game Systems and
that Weaver “believe[d]” that the payments were sent to Tronics and “Forbes
Hutton.”  The second paragraph contains the assertion that “[Tronics] took from
Game Systems the source code for a separate computer program that was designed
by Game Systems at a cost of well over $1 million, and which constitutes a
trade secret of Game Systems.  This was done without Game Systems’[s] consent
or authorization.”

          The
assertions in Weaver’s affidavit that Tronics took Game Systems’s source code
are conclusory.[66]  Weaver does not offer
any facts showing a basis for knowledge that Tronics took Game Systems’s source
code.  He does not state why he believes that Tronics took Game Systems’s
property; he does not describe what source code he refers to or how it came
into Tronics’s possession.

          Furthermore,
we have already discussed the paragraph respecting Weaver’s assertions about
Tronics and Leasing’s interactions with Seven Sky and the cease and desist
letters themselves.  For the same reason that this evidence was not sufficient
evidence to raise a fact issue about whether Game Systems suffered any damages
with respect to its tortious interference claim, the evidence was also not
sufficient to raise a fact issue about damages with respect to Game Systems’s
conversion claim against Tronics and Leasing.  The trial court therefore did
not err by granting summary judgment on Game Systems’s conversion claim against
Tronics and Leasing.

          In
response to Houchin’s summary judgment motion, Game Systems directed the trial
court to the following evidence: the patent application submitted on behalf of
EMT by Houchin, a patent application submitted by Houchin individually, and a
paragraph in Weaver’s affidavit.  In that paragraph, Weaver states that “during
the night of October 31, 2004, Houchin and Canard stole the developmental . . .
software for Hello Money and the Class II games.  Although one developmental
server was returned to Game Systems, Game Systems was never given back any of
the Class II developmental software.”  Weaver then 0states that “Houchin
applied for the Hello Money software patent in his own name and caused that
patent to be issued only to him in all contravention of his agreement with me
[and] Olmstead.”

          With
respect to Game Systems’s claim that Houchin converted the Hello Money
software, the trial court correctly granted summary judgment for Houchin.  Game
Systems did not offer evidence raising a fact issue on whether it owns the
Hello Money software, and in fact, its response states (as does Weaver in his
affidavit) that Game Systems was never intended to be the owner of the
software.  EMT was formed to be the holder of the proprietary rights to the
Hello Money software, and its four owners, not Game Systems, were to apply for
the patent on the software.  Game Systems also did not introduce evidence that
it had the right of possession of the software,[67]
especially given the fact that Houchin was part owner of the company that
allegedly owned or was intended to own the software.  Game Systems pointed to
no evidence that it had some sort of agreement with EMT that would entitle it
to possession over an owner of EMT.  Game Systems therefore failed to raise a
fact issue as to whether Houchin wrongfully exercised dominion or control over
property belonging to Game Systems.

          Furthermore,
Game Systems pointed to no evidence that Hello Money had any value at the time
of the alleged conversion.  Nor did Game Systems indicate any evidence of the
Class II software’s value.  Game Systems did not seek the return of this
software; it only sought compensation for the software’s loss.  But although
Weaver included a statement in his affidavit that Game Systems had paid
“hundreds of thousands of dollars” developing the Hello Money and Class II
software, Game Systems failed to point out any evidence of the actual value of
either software at the time of conversion.[68]  Game Systems therefore
failed to point out any evidence that it incurred damages.  Accordingly, the
trial court correctly granted summary judgment for Houchin on Game Systems’s
conversion claim.  We overrule Game Systems’s ninth issue.

G. 
Game Systems’s Breach of Contract Claim

          Game
Systems argues in its tenth issue that the trial court erred by granting
no-evidence summary judgment on Game Systems’s breach of contract claim against
Tronics because Game Systems produced evidence raising a fact issue as to each
of the challenged elements.

          In
Tronics’s motion, it asserted that there was no evidence (1) that Game Systems
performed, tendered performance of, or was excused from performing its
contractual obligations; (2) that Tronics breached the contract; or (3) that
Tronics’s breach caused injury to Game Systems.

          In
its response to the motion in the trial court, Game Systems relied on a copy of
“the original letter of intent,” plus the following excerpts from Weaver’s
affidavit:

[Tronics] never
supplied a finite game to Game Systems.  All of the games supplied were the
Texas Zero games which were supposedly for testing purposes and which ran off
of random number generators.

 

. . . [T]his
non-finite software was found to have serious defects.  [Tronics] failed to
support and maintain the software. As a result, Game Systems has had to spend,
and is continuing to spend, hundreds of thousands of dollars fixing the broken
software, which is already in the field and cannot be withdrawn without even
greater expense.  Additionally, following execution of the Letter of Intent,
performances and obligations varied from the Letter of Intent.

 

          This
evidence does not raise a fact issue as to whether Game Systems suffered any
injury as a result of a breach of the letter of intent by Tronics.  The
statement that “following execution of the Letter of Intent, performances and
obligations varied from the Letter of Intent” is conclusory and is no
evidence.  The statements that “[Tronics] failed to support and maintain the
software” and that “Game Systems has had to spend, and is continuing to spend,
hundreds of thousands of dollars fixing the broken software” are not evidence
of injury because the letter of intent is not clear as to which entity was
responsible for supporting the software and fixing the unspecified defects, nor
does other evidence provide clarification.  The letter of intent states that
Tronics would be responsible for support and maintenance, at its cost, “as per
SMA (Support and Maintenance Agreement to be provided within 30 days).”  The
SMA is not referenced as part of the summary judgment evidence and does not
appear to have been included with it, so there is no basis from which a court
can determine whether the alleged, unspecified defects should have been
remedied by Tronics.  Weaver also asserts in his affidavit that Tronics failed
to supply a finite game to Game Systems, but Game Systems did not point to any
evidence that by this failure, Game Systems was injured.  Accordingly, Game
Systems failed to produce sufficient summary judgment evidence to raise a fact
issue on its breach of contract claim.  We overrule Game Systems’s tenth issue.

H. 
Game Systems’s Usury Claim

          In
its eleventh issue, Game Systems asserts that the trial court erred by granting
summary judgment on its usury claim against Tronics and Leasing because Game
Systems produced evidence raising a fact issue as to each element of the claim. 
Game Systems contended at trial that “there was never a loan made,” but it
argued in the alternative that if such a loan had taken place, the loan
agreements raised an issue of fact on the challenged elements.[69]

          To
recover on a usury claim, a plaintiff must show “(1) a loan of money; (2) an absolute
obligation to repay the principal; and (3) the exaction of a greater
compensation than allowed by law for the use of the money by the borrower.”[70]
 In their no-evidence summary judgment motion, Tronics and Leasing challenged
each of these three elements.

          On
appeal, Game Systems points to evidence that it argues is sufficient for a
reasonable juror to find that Financial contracted for interest that exceeded
the maximum allowed by law, and, thus, the summary judgment should have been
denied.  But as for its claim against Tronics, although Game Systems contends
that if it received outside funding, the money came from Tronics rather than Financial,
it failed to produce sufficient evidence showing the terms of the loan.  Neither
LRA1 nor LRA2 supports a usury claim against Tronics because under their plain
language, Tronics is a borrower, not the lender, and Game Systems did not
direct the trial court to any evidence that it had borrowed money from Tronics
on the same terms as provided in either of those agreements.  Accordingly, the
trial court correctly granted no-evidence summary judgment for Tronics on the
usury claim.  We overrule this issue as to Tronics.

          Regarding
its claim against Leasing, Game Systems argues that “[t]here can be no question
as to whether” it produced evidence raising a fact issue as to the challenged
elements.  It points to the language of LRA2 as establishing the loan of money
and the absolute obligation of Game Systems to repay the loan, and to the
repayment schedule as evidence of a usurious rate of interest.  LRA2 provides
that Finanical will “lend” $3,000,000 to Game Systems under a non-revolving
term loan, to be advanced in weekly amounts.  LRA2 provides that “[t]his loan
will not bear interest prior to default” and would bear interest at the rate of
ten percent per year after default.  But although LRA2 provides that the loan
would not bear interest before default, it further provides that Game Systems
would make monthly payments to Financial regardless of whether it was in
default, and these payments, over the course of a year, added up to more than
the principal advanced.  Thus, although LRA2 states that the loan carries no
interest, it does provide for the repayment of more than the amount advanced.

          As
noted by Game Systems, the maximum interest rate that could be charged for a commercial
loan at the time of the effective date of LRA2 was eighteen percent per year.[71]
 Eighteen percent of $3,000,000 is $540,000.  LRA2 required Game Systems to
make payments over the year that totaled approximately $3,900,000, meaning that
if the money advanced constituted a loan, Financial stood to earn approximately
$900,000 in interest, an amount well over the statutory maximum.

          Leasing
argues that LRA2 could not be usurious because LRA2 only required Game Systems
to pay “a percentage of revenues until the principal is repaid and thereafter a
smaller percentage of revenues as a royalty.”  It contends that there was no
absolute obligation to repay the principal and that if Game Systems had no
revenue from the terminals, it had no obligation to pay anything.  But LRA2
does require Game Systems to repay the loan, regardless of whether it had any
revenue from the terminals.  If Game Systems failed to perform any of its
obligations or covenants under the agreement, under the terms of LRA2, the
principal became immediately due and payable without further notice or demand.  As
one of its obligations, Game Systems was required to pay Financial twenty-five
percent of its gross revenue from the Hello Money games.  But the amount Game
Systems had to pay every month was not in reality based on its actual revenues
because LRA2 defined the term “gross revenue” as the amount from purchase of
phone time less certain specified deductions, “but not less than the
weekly amounts documented on the [attached Schedule II].”[72] 
[Emphasis added]  In other words, Game Systems was required to pay Financial minimum
payments, over the course of one year, as set out in an attached schedule stating
the amount of money to be paid, and these payments were required regardless of
whether Game Systems earned any revenue.  Thus, its payments to Financial were
not contingent on it earning revenue from the games.

          Game
Systems’s obligation to repay the principal was absolute, as was its
requirement to continue making payments through a twelve-month period
established by Schedule II of the agreement, even after the principal had been
repaid.  And if Game Systems did not make the minimum payments and failed to
remedy its nonpayment within seven days of notice and demand from Financial,
then the nonpayment of that minimum amount constituted an event of default,
which would trigger Game Systems’s obligation to immediately repay the entire
principal.  If Financial did in fact advance money to Game Systems under LRA2
(which is a fact issue), it did so in order to enable Game Systems to engage in
a business venture.  Because LRA2 provides that that the advance was made on
the understanding that the advance and an added amount had to be returned, the
advance constituted a loan.[73]  And we hold that Game
Systems has submitted sufficient evidence to defeat Leasing’s no-evidence
motion as to whether this loan was usurious.  As the assignee of Financial’s
cause of action, Leasing was subject to any defenses to its claim that Game
Systems could have asserted against Financial.[74]  Thus, Leasing is
subject to Game Systems’s usury claim.

The
trial court therefore erred by granting no-evidence summary judgment on Game Systems’s
usury claim against Leasing.[75]  We sustain Game Systems’s
eleventh issue as to its claim against Leasing.

I. 
Game Systems’s Misappropriation of Trade Secrets Claim

          In
its twelfth issue, Game Systems argues that the trial court erred by granting
summary judgment on its misappropriation of trade secrets claim against Houchin
and Tronics because there is a fact issue on each element challenged in the
no-evidence motions.

          A
trade secret is (1) a formula, pattern, device, or compilation of information
(2) that is used in one’s business and (3) that “presents an opportunity to
obtain an advantage over competitors who do not know or use it.”[76]
 To determine whether a trade secret exists, we consider six nonexclusive
factors:

(1) the extent to
which the information is known outside of his business; (2) the extent to which
it is known by employees and others involved in his business; (3) the extent of
measures taken by him to guard the secrecy of the information; (4) the value of
the information to him and to his competitors; (5) the amount of effort or
money expended by him in developing the information; [and] (6) the ease or
difficulty with which the information could be properly acquired or duplicated
by others.[77]

 

A
claim for misappropriation of trade secrets accrues when the trade secret is
actually used.[78]

          In
both Houchin’s and Tronics no-evidence motions, they asserted that there was no
evidence (1) that Game Systems owned a trade secret; (2) that they used or
disclosed the trade secret in violation of a confidential or contractual
relationship with Game Systems after acquiring the trade secret by improper
means or with notice that the disclosure was improper; or (3) that Game Systems
suffered injury.

          Game
Systems’s entire response to Houchin’s motion is as follows:

          To
demonstrate that there is evidence raising an issue of fact on these elements,
Game Systems refers the [trial court] to the following evidence:

 

a.       Affidavit of
[Weaver], attached as Exhibit A, Paragraph 20, in which Weaver testifies that
“since November of 2004, Canard and his company [Hest Technologies], along with
Houchin and other entities in which he is involved have used the Hello Money
software and the Class II software that was stolen from Game Systems.”

 

          Game
Systems similarly responded to Tronic’s motion for no-evidence summary judgment
with the following:

          To
demonstrate that there is evidence raising an issue of fact on these elements,
Game Systems refers the [trial court] to the following evidence:

 

a.       Affidavit of
[Weaver], attached as Exhibit A, Paragraph 27, in which Weaver testifies that
“[Tronics] took from Game Systems the source code for a separate computer
program that was designed by Game Systems at a cost of well over $1 million,
and which constitutes a trade secret of Game Systems.  This was done without
Game Systems’s[s] consent or authorization.”

 

          The
evidence to which Game Systems directed the trial court does not meet Game Systems’s
burden.  Game Systems did not offer evidence raising a fact issue on whether it
owns the Hello Money software, and in fact, its response states (as does Weaver
in his affidavit) that Game Systems was never intended to be the owner of the
software.  EMT was formed to be the holder of the proprietary rights to the
Hello Money software, and its four owners, not Game Systems, were to apply for
the patent on the software.  Furthermore, Weaver’s affidavit is not sufficient
evidence to raise a fact issue that either the Hello Money or Class II software
constitute a trade secret.  Although Weaver states that Game Systems spent
hundreds of thousands of dollars developing the Hello Money software and the
Class II software and over $1,000,000 developing other (unspecified) gaming
software, the evidence pointed out by Game Systems does not provide support for
any of the other six factors, including the extent to which the information in
the software was, in fact, a secret.[79]  The only evidence that
the software is a trade secret is Weaver’s statement that the software
“constitutes a trade secret of Game Systems,” and as this statement is
conclusory, it is not competent summary judgment evidence.[80] 
We hold that the evidence pointed out by Game Systems is not sufficient to
raise a fact issue on the challenged elements of the claim.  Accordingly, we
overrule Game Systems’s twelfth issue.

J. 
The Parties’ Defensive Claims

          Game
Systems’s thirteenth, fourteenth, and fifteenth issues address various defenses
asserted by Appellees, and its sixteenth issue addresses its own affirmative
defenses.  Game Systems argues in its thirteenth issue that the trial court
erred by granting summary judgment on Houchin’s affirmative defense of the
business judgment rule because (1) that rule provides no defense to Game Systems’s
claim that Houchin breached the duty of loyalty and (2) there is a genuine
issue of material fact as to whether Houchin breached that duty.  Houchin
asserted the business judgment rule as a defense to Game Systems’s breach of
fiduciary duty and fraud claims against him.  Because we have already held that
the trial court did not err by granting no-evidence summary judgment for
Houchin on these claims, we do not address this issue.[81]

          In
its fourteenth issue, Game Systems argues that the trial court erred by
granting summary judgment on its claims for conversion and tortious
interference based on the defense of illegality.  Because we have held that the
trial court did not err by granting no-evidence summary judgment for Appellees on
these claims, we do not address this issue.[82]

          In
Game Systems’s fifteenth issue, it argues that the trial court erred by
granting traditional summary judgment for Houchin on his affirmative defenses
of ratification and estoppel.  Houchin asserted ratification and estoppel as a
defense to the claims against him for breach of fiduciary duty, fraud, and
tortious interference.  Because we have already held that the trial court did
not err by granting no-evidence summary judgment for Houchin on these claims,
we do not address this issue.[83]

          In
Game Systems’s sixteenth issue, it argues that the trial court erred by
granting summary judgment on all of its affirmative defenses because Tronics
and Leasing did not move for summary judgment on any of Game Systems’s
defenses.  Game Systems is correct that a trial court may not grant summary
judgment on a cause of action not addressed in a motion for summary judgment.[84] 
But a defendant’s mere pleading of an affirmative defense is not sufficient to
defeat summary judgment; a defendant relying on an affirmative defense in
opposing a summary judgment must come forward with summary judgment evidence
sufficient to raise an issue of material fact on each element of the defense.[85] 
Game Systems does not make any argument that it met its burden on its
affirmative defenses.  Accordingly, we overrule Game Systems’s sixteenth issue.

K. 
Attorney’s Fees

          In
Game Systems’s seventeenth issue, it argues that the trial court erred by
awarding to Tronics and Leasing appellate attorney’s fees that were not
conditioned upon whether Game Systems’s appeal was successful.

          The
trial court’s final judgment includes an award to Leasing of “$15,000.00 for
reasonable and necessary attorneys fees in the event of an appeal to the Court
of Appeals; and the further sum of $15,000.00 in the event of an appeal to the
Texas Supreme Court.”  The judgment includes the same award to Tronics.

          “A
trial court may not penalize a party for taking a successful appeal,” and,
accordingly, “[a]n unconditional award of attorney’s fees is improper.”[86] 
Here, the awards were unconditional, and, as Game Systems has prevailed on some
of its issues, the trial court’s error penalized Game Systems for its appeal.[87] 
We note that Leasing and Tronics candidly acknowledge in their brief that the
awards should have been contingent on a successful appeal.  We sustain Game Systems’s
seventeenth issue and set aside the trial court’s grant of appellate attorney’s
fees.

L. 
Admission of Evidence

          Game
Systems’s eighteenth issue is whether the trial court erred by admitting
evidence.  Game Systems does not have a specific section of its brief under
which it addresses this issue.  But in its sixth issue, it argues that the
trial court erred by admitting Financial’s assignment of its claim against Game
Systems to Leasing.  To the extent that this is the same evidence that Game
Systems refers to with respect to its eighteenth issue, we overrule Game Systems’s
eighteenth issue as moot; to the extent that Game Systems challenged
unspecified evidence, we overrule its eighteenth issue as inadequately briefed.[88]

M. 
Motion for New Trial

          Game
Systems’s nineteenth issue asks whether the trial court erred by denying its
motion for new trial.  As with its eighteenth issue, Game Systems does not have
a specific section of its brief under which it addresses this issue.  We were
unable to find elsewhere in Game Systems’s brief any argument supported by
authority with respect to this issue, and accordingly, we overrule it as
inadequately briefed.[89]

IV. 
Conclusion

          We
affirm in part and reverse in part.  Having sustained Game Systems’s sixth and eleventh
issues, we reverse the trial court’s judgment as to Game Systems’s usury claim
and Leasing’s breach of contract claim and remand this case in part to the
trial court for further proceedings on those claims.  Having sustained Game Systems’s
seventeenth issue, we modify the trial court’s judgment to delete the awards of
appellate attorney’s fees to Tronics and Leasing.  Having overruled Game Systems’s
remaining issues, we affirm the remainder of the trial court’s judgment as
modified.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
DAUPHINOT, MCCOY, and MEIER, JJ.

 

DELIVERED:  May 26, 2011









[1]See Tex. R. App. P. 47.4.





[2]Travelers Ins. Co. v.
Joachim, 315 S.W.3d 860, 862 (Tex. 2010).





[3]Mann Frankfort Stein
& Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).





[4]20801, Inc. v. Parker,
249 S.W.3d 392, 399 (Tex. 2008).





[5]Frost Nat’l Bank v.
Fernandez, 315 S.W.3d 494, 508 (Tex. 2010); see Tex. R. Civ. P.
166a(b), (c).





[6]See Tex. R. Civ. P.
166a(a), (c); MMP, Ltd. v. Jones, 710 S.W.2d 59, 60 (Tex. 1986).





[7]Frost Nat’l Bank,
315 S.W.3d at 508; see Tex. R. Civ. P. 166a(b), (c).





[8]Frost Nat’l Bank,
315 S.W.3d at 508–09; see Tex. R. Civ. P. 166a(b), (c).





[9]See Chau v. Riddle,
254 S.W.3d 453, 455 (Tex. 2008).





[10]Tex. R. Civ. P. 166a(i).





[11]Id.; Timpte Indus.,
Inc. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009).





[12]See Tex. R. Civ.
P. 166a(i) & cmt.; Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex.
2008).





[13]Sudan v. Sudan,
199 S.W.3d 291, 292 (Tex. 2006).





[14]Hamilton, 249
S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).





[15]Timpte Indus., 286
S.W.3d at 310 (quoting Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582
(Tex. 2006)).





[16]Smith v. O’Donnell,
288 S.W.3d 417, 424 (Tex. 2009); King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 751 (Tex. 2003), cert. denied, 541 U.S. 1030 (2004).





[17]Malooly Bros., Inc. v.
Napier, 461 S.W.2d 119, 121 (Tex. 1970); see also Plexchem Int’l, Inc.
v. Harris Cnty. Appraisal Dist., 922 S.W.2d 930, 930–31 (Tex. 1996).





[18]Malooly Bros., Inc.,
461 S.W.2d at 121.





[19]See Tex. R. App.
P. 38.1(i); Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d
279, 284 (Tex. 1994) (discussing “long-standing rule” that issues may be waived
due to inadequate briefing).





[20]See Kinzbach Tool Co.
v. Corbett-Wallace Corp., 138 Tex. 565, 574, 160 S.W.2d 509, 514 (1942)
(“[W]here a third party knowingly participates in the breach of duty of a
fiduciary, such third party becomes a joint tortfeasor with the fiduciary and
is liable as such.”); see also ERI Consulting Eng’rs, Inc. v. Swinnea, 318
S.W.3d 867, 881 (Tex. 2010).





[21]See Tex. R. Civ.
P. 166a(i) & cmt.





[22]See Gearhart Indus.,
Inc. v. Smith Int’l, Inc., 741 F.2d 707, 719–20 (5th Cir. 1984) (noting
that under Texas law a director is considered “interested” in a transaction if
the director (1) makes a personal profit from a transaction by dealing with the
corporation or usurps a corporate opportunity; (2) buys or sells corporate
assets; (3) transacts business in his director’s capacity with a second
corporation of which he is also a director or significantly financially
associated; or (4) transacts business in his director’s capacity with a family
member).





[23]See Popperman v. Rest
Haven Cemetery, Inc., 162 Tex. 255, 258, 345 S.W.2d 715, 717 (1961) (noting
that “it is also well settled that officers and directors of a corporation are
not disqualified from dealing with the corporation”); see also Tex. Bus.
Orgs. Code Ann. § 21.418 (West 2010) (providing circumstances under which a
transaction by an interested director or officer is valid); Int’l Bankers
Life Ins. Co. v. Holloway, 368 S.W.2d 567, 576 (Tex. 1963) (noting the “equitable
principle which calls corporate officers and directors to account to the
corporation for personal profits realized by them in breach of their fiduciary
duties”).





[24]Landon v. S & H
Mktg. Grp., Inc., 82 S.W.3d 666, 673 (Tex. App.—Eastland 2002, no pet.); Popperman,
162 Tex. at 717, 345 S.W.2d at 717 (noting that “contracts between officers and
directors and the corporation itself . . . are binding where the contracting
director establishes the fairness of the transaction to the corporation”)
(emphasis added).





[25]See Cotten v.
Weatherford Bancshares, Inc., 187 S.W.3d 687, 699 (Tex. App.—Fort Worth
2006, pet. denied) (holding that the trial court did not err by granting a
motion for directed verdict on the plaintiff’s breach of fiduciary duty claim
because there was no evidence that the defendants owed any fiduciary duties).





[26]See Tex. Bus.
Orgs. Code Ann. § 21.101(a)(9) (West 2010) (“The shareholders of a corporation
may enter into an agreement that . . .  grants authority to a shareholder or
other person to resolve any issue about which there is a deadlock among the
directors, shareholders, or other persons authorized to manage the
corporation.”).





[27]See Peckham v. Johnson,
98 S.W.2d 408, 416 (Tex. Civ. App.—Fort Worth 1936) (noting that a fiduciary
relationship can be created by contract), aff’d, 132 Tex. 148, 120
S.W.2d 786 (1938); see also Envtl. Procedures, Inc. v. Guidry,
282 S.W.3d 602, 628 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (same).





[28]See Guilbeau v.
Anderson, 841 S.W.2d 517, 519 (Tex. App.—Houston [14th Dist.] 1992, no
writ) (stating that a corporation can be held liable for the torts committed by
its agents or employees while acting in the course and scope of their
employment); Douglas v. Aztec Petroleum Corp., 695 S.W.2d 312, 319 (Tex.
App.—Tyler 1985, no writ) (noting that breach of fiduciary duty is a tort).





[29]See, e.g., M.R.
Champion, Inc. v. Mizell, 904 S.W.2d 617, 618 (Tex. 1995) (stating that after
a partnership terminates, the fiduciary duty that partners owe each other is
limited to matters relating to winding up the partnership and that a person has
no duty to offer his former partners or partnership a business opportunity that
arises after the partnership has terminated).





[30]See Hoggett v. Brown,
971 S.W.2d 472, 488 n.13 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); see
also Pabich v. Kellar, 71 S.W.3d 500, 504 (Tex. App.—Fort Worth
2002, pet. denied) (noting that whether a fiduciary duty exists depends on the
circumstances but that “[a] co-shareholder in a closely held corporation does
not as a matter of law owe a fiduciary duty to his co-shareholder”).





[31]See Popperman, 345
S.W.2d at 717.





[32]See Tex. R. Civ.
P. 166a(i).





[33]See id.





[34]See Tex. R. Civ.
P. 166a(i) & cmt.





[35]See Priddy v. Rawson,
282 S.W.3d 588, 598 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (noting
that the appellants, in their response to the appellee’s no-evidence summary
judgment motion on their fraud claim, had not identified any misrepresentations
by the appellee, and stating that the court had no duty to perform an
independent review of the record for evidence supporting the appellants’
position).





[36]See King Ranch, Inc.,
118 S.W.3d at 755 (holding that the plaintiffs’ evidence on their extrinsic
fraud claims really consisted of no more than theories and suspicions and could
not defeat a no-evidence summary judgment motion).





[37]See McEwin v. Allstate
Tex. Lloyds, 118 S.W.3d 811, 816 (Tex. App.—Amarillo 2003, no pet.)
(stating that “not all fraud is comprehended within elements of the traditional
test” and that “[t]he gist of fraud is successfully using cunning, deception or
artifice to cheat another to the other’s injury”).





[38]W. Reserve Life
Assurance Co. of Ohio v. Graben, 233 S.W.3d 360, 376 (Tex. App.—Fort Worth
2007, no pet.).





[39]See, e.g., Grant
Thornton LLP v. Prospect High Income Fund, 314 S.W.3d 913, 922–23 (Tex.
2010) (stating that fraud requires the plaintiff to show an intent to deceive
and actual and justifiable reliance); Schlumberger Tech. Corp. v. Swanson,
959 S.W.2d 171, 181 (Tex. 1997) (noting that reliance is an element of fraud by
non-disclosure, a subcategory of fraud “because, where a party has a duty to
disclose, the non-disclosure may be as misleading as a positive
misrepresentation of facts”).





[40]Fieldtech Avionics
& Instruments, Inc. v. Component Control.Com, Inc., 262 S.W.3d 813, 825
(Tex. App.—Fort Worth 2008, no pet.) (citing Harris v. Am. Prot. Ins. Co.,
158 S.W.3d 614, 622–23 (Tex. App.—Fort Worth 2005, no pet.)).





[41]The record also includes
testimony from Houchin at the temporary injunction hearing, produced by Game
Systems in response to Houchin’s summary judgment motion, that Di Carlo
dispersed the funds to Game Systems (and at some point began deducting $18,500
from the amount dispersed weekly “as an advance against his royalty payments”),
which supports Game Systems’s contention that it obtained funding from Tronics,
not Financial.





[42]See Fieldtech Avionics,
262 S.W.3d at 825 (stating the elements of a breach of contract claim); see
also Tex. R. Civ. P. 166a.





[43]See Melody v. Tex.
Soc’y of Prof’l Eng’rs, 421 S.W.2d 693, 695–96 (Tex. Civ. App.—Dallas 1967,
no writ) (noting that generally, statements of an interested witness do no more
than raise a fact issue, although such statements may be taken as true when the
statements are, among other things, uncontradicted by the opposite party who
had the means to disprove them if they were false).





[44]See Tex. R. Civ.
P. 166a(a), (c); MMP, Ltd., 710 S.W.2d at 60.





[45]Tex. R. Evid. 801(d).





[46]See Tex. R. Evid.
803(6).





[47]Tex. R. Evid. 902(10)(b).





[48]Id.





[49]Id.





[50]Id.





[51]Tex. R. Evid. 803(6),
902(10).





[52]See Hunte v. Hinkley,
731 S.W.2d 570, 571 (Tex. App.—Houston [14th Dist.] 1987, writ ref’d n.r.e.)
(noting that “[a] trial court has authority to reconsider its own rulings as
long as it retains jurisdiction”).





[53]See Malooly Bros.,
Inc., 461 S.W.2d at 121 (holding that summary judgment must stand since it
may have been based on a ground not specifically challenged on appeal); Shelton
v. Sargent, 144 S.W.3d 113, 129 (Tex. App.—Fort Worth 2004, pet. denied)
(affirming summary judgment on unchallenged ground).





[54]See, e.g., Navistar
Int’l Transp. Corp. v. Crim Truck & Tractor Co., 883 S.W.2d 687, 688
(Tex. App.—Texarkana 1994, writ denied) (noting that the franchise agreement
between the parties provided that the appellant could unilaterally terminate
the franchise only if the appellee breached certain conditions); Hansson
v. Time Warner Entm’t Advance, 03-01-00578-CV, 2002 WL 437297, at *1 (Tex.
App.—Austin Mar. 21, 2002, pet. denied) (not designated for publication)
(construing an employment contract providing that the employee could terminate
her employment only under certain conditions); Union Natural Gas Co.
v. Enron Gas Mktg., Inc., 14-98-00183-CV, 2000 WL 350546, at *4 (Tex.
App.—Houston [14th Dist.] Apr. 6, 2000, no pet.) (not designated for publication)
(discussing language in a contract providing that the contract “shall not be
terminated” except in circumstances specified in the contract); Alphagraphics
Franchising, Inc. v. Babbitt, 01-88-00101-CV, 1989 WL 2427, at *1 (Tex.
App.—Houston [1st Dist.] Jan. 18, 1989, no writ) (not designated for
publication) (noting that the parties’ franchise agreement provided that
franchisee’s license would terminate “[i]f, and only if” certain conditions
occurred).





[55]Mustang Pipeline Co.,
Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195, 196 (Tex. 2004) (“It is
a fundamental principle of contract law that when one party to a contract
commits a material breach of that contract, the other party is discharged or
excused from further performance.”).





[56]See Hernandez v. Gulf Grp.
Lloyds, 875 S.W.2d 691, 693 (Tex. 1994) (“In determining the materiality of
a breach, courts will consider, among other things, the extent to which the
nonbreaching party will be deprived of the benefit that it could have
reasonably anticipated from full performance.”); see also Mustang
Pipeline Co., 134 S.W.3d at 200 (holding as a matter of law, based on the
evidence and the contract’s language, that the appellee’s breach of the
contract was material).





[57]See Souder v. Cannon,
235 S.W.3d 841, 849 (Tex. App.—Fort Worth 2007, no pet.) (“A conclusory
statement is one that does not provide the underlying facts to support the
conclusion.”).





[58]See Tex. R. Civ.
P. 166a(c); McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337,
341 (Tex. 1993).





[59]Lulirama Ltd., Inc. v.
Axcess Broad. Servs., Inc., 128 F.3d 872, 874 (5th Cir. 1997).





[60]Id. at 879.





[61]Id. at 882.





[62]Id. at 883.





[63]See Johnson v. Jones,
885 F. Supp. 1008, 1014 (E.D. Mich. 1995) (noting that “[t]ypically, federal
courts apply the relevant state law in determining questions of contract”).





[64]Lulirama Ltd., 128
F.3d at 883.





[65]See Am. Nat’l Petrol.
Co. v. Transcon. Gas Pipe Line Corp., 798 S.W.2d 274, 278 (Tex. 1990)
(stating that “[t]he basic measure of actual damages for tortious interference
with contract is . . . to put the plaintiff in the same economic position he
would have been in had the contract interfered with been actually performed”).





[66]See Souder, 235
S.W.3d at 849.





[67]See Anchor Mortgage
Servs., Inc. v. Poole, 738 S.W.2d 68, 69 (Tex. App.—Fort Worth 1987, writ
denied) (“It is essential that the plaintiff establish some interest in the
property as of the time of the alleged conversion such as title or otherwise
some right to possession.”).





[68]See Prewitt v. Branham,
643 S.W.2d 122, 123 (Tex. 1982) (stating that absent pleading or proof that
converted property was of fluctuating value, the measure of damages is the
value of the property at the time and place of conversion); see also United
Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 147–48 (Tex. 1997)
(stating that generally the measure of damages for conversion is the fair
market value of the property at the time and place of conversion).





[69]Leasing also makes
alternative claims with respect to the loan royalty agreements, claiming that
Game Systems breached LRA2 by failing to repay a loan but that the loan was not
usurious because there was no absolute obligation to repay the loan.





[70]First Bank v. Tony’s
Tortilla Factory, Inc., 877 S.W.2d 285, 287 (Tex. 1994).





[71]See Tex. Fin. Code
Ann. § 303.008 (West 2004) (providing that the consumer credit commissioner
shall set the quarterly ceiling and annualized ceiling for the calendar
year); Tex Fin. Code Ann. § 303.009(a) (providing a ceiling of eighteen percent
a year); see also Rate Bracket Adjustment & Market Competitive Rate
Ceilings, Office of Consumer Credit Commissioner, at
http://www.occc.state.tx.us/pages/int_rates/brack_ceil.htm#rate_ceil (last
visited May 26, 2011) (setting the ceiling for the period May 2004 at eighteen
percent).





[72]We note that this “not
less than” language does not appear in LRA1.





[73]See Johns v. Jaeb,
518 S.W.2d 857, 859 (Tex. Civ. App.—Dallas 1974, no writ); cf. Korth v.
Tumlinson, 73 S.W.2d 1048, 1049 (Tex. Civ. App.—San Antonio 1934, no writ)
(finding agreement to advance funds in exchange for promise to pay one-third of
net proceeds upon sale of parcel of land not usurious because terms of contract
did not show that principal would be absolutely repayable and instead showed
that if land was not sold, lender would receive nothing).





[74]Vogt v. Jones, 396
S.W.2d 539, 540 (Tex. Civ. App.—Fort Worth 1965, no writ) (noting that an
assignee’s right against an obligor under a contract is subject to all defenses
to the contract’s enforcement, provided that such defenses are based on facts
existing at the time of the assignment or on facts arising after the assignment
but prior to the obligor’s knowledge of the assignment).





[75]See Tex. R. Civ.
P. 166a(i).





[76]Computer Assocs.
Int’l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996).





[77]In re Bass, 113
S.W.3d 735, 739 (Tex. 2003) (quoting from Restatement of Torts § 757 cmt. B
(1939), now moved to Restatement (Third) of Unfair Competition § 39 reporter’s n.
cmt. d (1995)).





[78]Computer Assocs.,
918 S.W.2d at 455.





[79]See In re Bass,
113 S.W.3d at 739 (listing factors to consider).





[80]See Ryland Grp., Inc.
v. Hood, 924 S.W.2d 120, 122 (Tex. 1996) (“Conclusory affidavits are not
enough to raise fact issues.”); Shelton, 144 S.W.3d at 126 (noting
same); see also Souder, 235 S.W.3d at 849.





[81]See Tex. R. App.
P. 47.1.





[82]See id.





[83]See id.





[84]Chessher v. Sw. Bell
Tel. Co., 658 S.W.2d 563, 564 (Tex. 1983); Shelton, 144 S.W.3d at
121.





[85]Bassett v. Am. Nat’l
Bank, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no pet.); see also
Ryland Grp., 924 S.W.2d at 121; Gulf, Colo. & Santa Fe Ry. Co. v.
McBride, 159 Tex. 442, 454, 322 S.W.2d 492, 500 (1958).





[86]Humble Nat’l Bank v.
DCV, Inc., 933 S.W.2d 224, 236 (Tex. App.—Houston [14th Dist.] 1996, writ
denied); see also Tex. Farmers Ins. Co. v. Cameron, 24 S.W.3d 386,
400–01 (Tex. App.—Dallas 2000, pet. denied).





[87]See Arena v. Arena,
822 S.W.2d 645, 651 (Tex. App.—Fort Worth 1991, no writ); King Optical v.
Automatic Data Processing of Dallas, Inc., 542 S.W.2d 213, 218 (Tex. Civ.
App.—Waco 1976, writ ref’d n.r.e.) (“[A] trial court may not penalize a party
for taking a successful appeal by taxing him with attorneys’ fees if he takes
it.”).





[88]See Tex. R. App.
P. 38.1(i).





[89]See id.